No. 22-2275

# United States Court of Appeals
## *for the*
## Fourth Circuit

———————————————

Chamber of Commerce of the United States of America,
NetChoice, and Computer & Communications Industry Association,

*Plaintiffs-Appellants*,

– v. –

Brooke E. Lierman,

*Defendant-Appellee.*

———————————————

On appeal from the
United States District Court for the District of Maryland
Case No. 21-cv-410-LKG

———————————————

**CORRECTED OPENING BRIEF**

———————————————

Tara S. Morrissey
Jennifer B. Dickey
Tyler S. Badgley
  *U.S. Chamber Litigation Center*
  *1615 H Street NW*
  *Washington, DC 20062*
  *(202) 463-5337*

*Counsel for the Chamber of Commerce*
*of the United States of America*

Michael B. Kimberly
Sarah P. Hogarth
Charles Seidell
  *McDermott Will & Emery LLP*
  *500 N. Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for all Appellants*

## CORPORATE DISCLOSURE STATEMENT

Appellants are the Chamber of Commerce of the United States of America, NetChoice, and the Computer & Communications Industry Association. Each is a membership-based trade association.

None issues stock or has any parent corporation.

None is aware of any publicly held corporation with a direct financial interest in the outcome of the litigation by reason of a franchise, lease, other profit-sharing agreement, insurance, or indemnity agreement.

None is aware of any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding.

Although each relies on associational standing to assert injuries of all members affected by the Act, none is pursuing the claims of any particular member in a representative capacity.

/s/ *Michael B. Kimberly*

## TABLE OF CONTENTS

Table of Authorities...................................................................................iv

Introduction ........................................................................................... 1

Jurisdictional Statement ....................................................................... 2

Issues Presented for Review ................................................................. 3

Statement ............................................................................................... 3

    A.  The Digital Advertising Gross Revenues Tax Act.................... 3

        1.  The Act's provisions .................................................. 4

        2.  The pass-through provision ....................................... 6

        3.  The Act's other unusual characteristics ................... 6

    B.  Procedural background ................................................... 8

Standard of Review............................................................................... 14

Argument ............................................................................................... 15

I.    The Court should hold that the pass-through provision violates
the First Amendment (Count IV) ........................................................ 15

    A.  The challenge to the pass-through provision is not moot ............... 15

        1.  The challenge to the pass-through provision is not moot
in the Article III sense ............................................... 15

        2.  The challenge to the pass-through provision is not
prudentially moot.................................................... 19

    B.  The pass-through provision violates the First Amendment............23

        1.  The pass-through provision is a content-based ban on
political speech ......................................................24

        2.  The pass-through provision fails any level of scrutiny ............. 31

        3.  The pass-through provision is facially invalid ......................... 35

    C.  No further proceedings on Count IV are warranted .......................36

II.  The Court should reverse the dismissal of Counts I-III and remand for further proceedings ............................................. 36

    A.  Counts I-III are not mooted by the state court order ....................... 37

    B.  Counts I-III are not barred by the TIA ............................................. 38

        1.  The TIA applies to "classic" taxes, not to punitive fees ........... 38

        2.  Under a totality-of-circumstances analysis, the surcharge here is a punitive fee that may be reviewed in federal court ................................................................... 45

III.  The Court must at minimum remand with instructions to vacate the TIA decision and modify the final judgment ................................... 55

Conclusion ................................................................. 56

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart v. Rhode Island,*
    517 U.S. 484 (1996)................................................................ 33, 35

*Already, LLC v. Nike, Inc.,*
    568 U.S. 85 (2013)....................................................................15

*American Trucking Ass'n v. Alviti,*
    944 F.3d 45 (1st Cir. 2019) .....................................44, 51, 52

*AT&T Corp. v. Rudolph,*
    2007 WL 647564 (E.D. Ken. Feb. 27, 2007) ......................... 34

*Austin v. United States,*
    509 U. S. 602 (1993) ............................................................... 55

*Bailey v. Drexel Furniture Co.,*
    259 U.S. 20 (1922) ....................................................... 39, 40, 54

*BellSouth Telecommunications, Inc. v. Farris,*
    542 F.3d 499 (2008)............................................ 25, 28, 29, 34

*Benham v. City of Charlotte,*
    635 F.3d 129 (4th Cir. 2011)................................................ 22

*Bidart Bros. v. California Apple Commission,*
    73 F.3d 925 (9th Cir. 1996) ....................................... 39, 44, 47

*Bloom v. O'Brien,*
    841 F. Supp. 277 (D. Minn. 1993) ....................................... 34

*Bolger v. Youngs Drug Products Corp.,*
    463 U.S. 60 (1983) ................................................................. 30

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 2011 ................................................................. 35

*Bruni v. City of Pittsburgh,*
    824 F.3d 353 (3d Cir. 2016).................................................. 35

*Burson v. Freeman,*
    504 U.S. 191 (1992).................................................................31

*Central Hudson Gas & Electric Corp. v.*
    *Public Service Commission,*
    447 U.S. 557 (1980)............................................... 30, 32, 33, 35

## Cases—continued

*Central of Georgia Railway v. Wright*,
    207 U.S. 127 (1907) ............................................................ 40, 55

*Chafin v. Chafin*,
    568 U.S. 165 (2013) ............................................................ 15, 18

*Citizens United v. FCC*,
    558 U.S. 310 (2010) ................................................. 29, 32, 35

*City of Austin v. Reagan National Advertising*,
    142 S. Ct. 1464 (2022) ............................................................ 28

*Cohens v. Virginia*,
    19 U.S. (6 Wheat.) 264 (1821) ............................................ 20

*Collins Holding Corp. v. Jasper County*,
    123 F.3d 797 (4th Cir. 1997) ........................................ 43, 44

*Consolidated Edison Co. of New York v. Pataki*,
    292 F.3d 338 (2d Cir. 2002) ........................................ 44, 50

*In re Continental Airlines*,
    91 F.3d 553 (3d Cir. 1996) .................................................... 20

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) ............................................... 22

*Denton v. City of Carrollton, Georgia*,
    235 F.2d 481 (5th Cir. 1956) ................................. 42, 44, 46

*Department of Revenue of Montana v. Kurth Ranch*,
    511 U.S. 767 (1994) ................................................. 42, 44, 46

*Direct Marketing Association v. Brohl*,
    575 U.S. 1 (2015) ............................................................. 39, 41

*Doe v. City of Albuquerque*,
    667 F.3d 1111 (10th Cir. 2012) ......................................... 35

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ........................................................ 33, 34

*Educational Media Co. at Virginia Tech v. Insley*,
    731 F.3d 291 (4th Cir. 2013) ............................................... 33

*Ellis v. Railway Clerks*,
    466 U.S. 435 (1984) ............................................................. 16

## Cases—continued

*Elsevier, Inc. v. Muchnick,*
    559 U.S. 154 (2010) ..................................................................... 56

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.,*
    651 F.3d 722 (7th Cir. 2011) ...................................................... 42

*Expressions Hair Design v. Schneiderman,*
    137 S. Ct. 1144 (2017) ................................................................. 25

*Friends of the Earth v. Laidlaw Environmental Services (TOC),*
    528 U.S. 167 (2000) ..................................................................... 22

*Garrison v. Louisiana,*
    379 U.S. 64 (1964) ....................................................................... 29

*GenOn Mid-Atlantic v. Montgomery County,*
    650 F.3d 1021 (4th Cir. 2011) ............................................*passim*

*Graham v. Dupont,*
    262 U.S. 234 (1923) ............................................................ 39, 54

*Greater Baltimore Center for Pregnancy Concerns v. Mayor & City of
    Baltimore,*
    721 F.3d 264 (4th Cir. 2013) ...................................................... 35

*Hawaiʻi v. Trump,*
    241 F. Supp. 3d 1119 (D. Haw. 2017) ....................................... 38

*The Head Money Cases,*
    112 U.S. 580 (1884) ..................................................................... 40

*Hibbs v. Winn,*
    542 U.S. 88 (2004) ....................................................................... 56

*International Refugee Assistance Project v. Trump,*
    265 F. Supp. 3d 570 (D. Md. 2017) ........................................... 38

*June Medical Services LLC v. Russo,*
    140 S. Ct. 2103 (2020) ................................................................. 23

*Kathrein v. City of Evanston, Illinois,*
    636 F.3d 906 (7th Cir. 2011) ................................................ 45, 55

*Kentucky v. U.S. ex rel. Hagel,*
    759 F.3d 588 (6th Cir. 2014) ...................................................... 20

## Cases—continued

*Knox v. Service Employees International Union,*
  567 U.S. 298 (2012) ........................................................16, 18

*Korte v. Sebelius,*
  735 F.3d 654 (7th Cir. 2013)........................................ 46, 47

*Lexmark International v. Static Control Components,*
  572 U.S. 118 (2014) ...................................................... 20, 21

*Lipke v. Lederer,*
  259 U.S. 557 (1922)....................................... 40, 41, 44, 54

*Retail Industry Leaders Ass'n v. Fielder,*
  475 F. 3d 180 (4th Cir. 2007)...............................................*passim*

*NFIB v. Sebelius,*
  567 U.S. 519 (2012) ............................................................ 39

*Norfolk Southern Railway Co. v. City of Alexandria,*
  608 F.3d 150 (4th Cir. 2010) ....................................... 55

*Norfolk Southern Railway v. City of Roanoke,*
  916 F.3d 315 (4th Cir. 2019)....................................... 43, 44

*North Carolina State Conference of the NAACP v. Raymond,*
  981 F.3d 295 (2020) ....................................................18, 37

*Perry v. Bartlett,*
  231 F.3d 155 (4th Cir. 2000)....................................... 23, 36

*Police Department of Chicago v. Mosley,*
  408 U.S. 92 (1972) ............................................................ 24

*Porter v. Clarke,*
  852 F.3d 358 (4th Cir. 2017) ..................................... 14

*R.A.V. v. St. Paul,*
  505 U.S. 377 (1992)....................................................... 24, 35

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015)....................................... 24, 27, 28, 31

*Regal Drug Corporation v. Wardell,*
  260 U.S. 386 (1922) ....................................................... 40

*S-1 v. Spangler,*
  832 F.2d 294 (4th Cir. 1987) .......................................21

**Cases—continued**

*San Juan Cellular Telephone Co. v.*
  *Public Services Commission of Puerto Rico,*
  967 F.2d 683 (1st Cir. 1992)................................................*passim*

*Shaw v. Hunt,*
  517 U.S. 899 (1996).................................................................. 32

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Board,*
  502 U.S. 105 (1991).................................................................. 24

*Southern Walk at Broadlands Homeowner's Association v.*
  *OpenBand at Broadlands,*
  713 F.3d 175 (4th Cir. 2013) ............................................. 55, 56

*Spann v. Martin,*
  963 F.2d 663 (4th Cir. 1992)................................................... 20

*Sprint Communications v. Jacobs,*
  571 U.S. 69 (2013)............................................................. 20, 21

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014)...................................................................21

*Texas Coal. of Cities for Utility Issues v. FCC,*
  324 F.3d 802 (5th Cir. 2003) ................................................... 29

*Trailer Marine Transportation v. Rivera Vazquez,*
  977 F.2d 1 (1st Cir. 1992) ....................................................*passim*

*Travelers Insurance v. Cuomo,*
  14 F.3d 708 (2d Cir. 1993) ....................................................... 44

*Turner Broadcasting Systems v. FCC,*
  512 U.S. 622 (1994)...................................................................31

*United States v. Alvarez,*
  567 U.S. 709 (2012) ................................................................. 35

*United States v. Concentrated Phosphate Export Association,*
  393 U.S. 199 (1968) ................................................................. 22

*United States v. Fresno County,*
  429 U.S. 452 (1977)................................................................. 30

*United States v. Munsingwear,*
  340 U.S. 36 (1950) ................................................................... 55

**Cases—continued**

*United States v. Playboy Entertainment Group,*
  529 U.S. 803 (2000) .................................................................... 32, 35

*United States v. Springer,*
  715 F.3d 535 (4th Cir. 2014) ....................................................15, 16

*United States v. Stevens,*
  559 U.S. 460 (2010) ............................................................................ 35

*United States v. United Foods, Inc.,*
  533 U.S. 405 (2001) ............................................................................ 30

*Valero Terrestrial Corp. v. Caffrey,*
  205 F.3d 130 (4th Cir. 2000) ................................... 42, 43, 44, 47

*Virginia State Board of Pharmacy v.*
  *Virginia Citizens Consumer Council,*
  425 U.S. 748 (1976)............................................................................ 30

*Wright v. Riveland,*
  219 F.3d 905 (9th Cir. 2000) ......................................................... 45

**Statutes**

28 U.S.C. § 1341 ....................................................................................... 38

47 U.S.C. § 151 ............................................................................................. 9

47 U.S.C. § 542(c)(1) ............................................................................ 29

Md. Tax-Gen. Code
  § 7.5-101 .................................................................*passim*
  § 7.5-101(e)(1).................................................................. 4
  § 7.5-101(f)........................................................................ 4
  § 7.5-101(e)(2) ................................................................ 4
  § 7.5-101(d)....................................................................... 4
  § 7.5-101(g)....................................................................... 5
  § 7.5-102(b)(1) ................................................................ 5
  § 7.5- 103 .......................................................................... 5
  § 7.5-201(b)(1) ........................................................... 6, 7
  § 7.5-201(b)(2) ................................................................ 6
  § 10-105(b)................................................................. 7, 46
  § 2-4A-01 ........................................................................... 7
  § 2-4A-02 ........................................................................... 7

**Statutes—continued**

Md. Educ. Code
    § 5-219 ................................................................................ 8
    § 1- 302(a)(1) ............................................................... 8, 52

## Other authorities

138 Cong. Rec. S561-02 (daily ed. Jan. 29, 1992) ......................................... 29

13B Fed. Prac. & Proc. Juris. § 3533.2.1 (3d ed. 2022) ....................... 16, 18, 37

Mem. Op. & Order, *The City of Pasadena, Cal., et al.*, Petitions for
    Declaratory Ruling, 2001 WL 1167612 (FCC Oct. 4, 2001) ..................... 29

Paul Romer, *A Tax That Could Fix Big Tech*, N.Y. Times (May 6, 2019) .......... 3

U.S. Trade Representative, *Report on France's Digital Services Tax Pre-
pared in the Investigation under Section 301 of the Trade Act of 1974*
(Dec. 2, 2019) ........................................................................... 47

## INTRODUCTION

When federal courts have jurisdiction over a case, it is their duty to exercise it in all but the most exceptional circumstances. The district court in this case twice refused to do so. First, it refused to review appellants' constitutional and statutory challenges to the punitive levy imposed by the Maryland Digital Advertising Gross Revenues Tax Act (the Act), in the mistaken belief that the federal Tax Injunction Act (TIA) bars such review. Then it refused on mootness grounds to rule on appellants' remaining challenge to the Act's speech ban, because a Maryland court in another case held the levy (but not the speech ban) to be unlawful. Neither reason for declining jurisdiction withstands scrutiny.

The Act assesses an extraordinary levy on large digital advertising companies that do business in Maryland. Imposed essentially as a recurring fine for perceived misconduct, the Act is punitive at every turn and functions nothing like a classic tax. And it is illegal many times over. It explicitly disadvantages electronic commerce relative to other commerce, violating the Internet Tax Freedom Act (ITFA). The severity of its surcharge is based on companies' extraterritorial conduct rather than their transactions within Maryland, violating the Commerce Clause and the Due Process Clause. And it prohibits companies from identifying the nature and amount of the levy on customer invoices in plain violation of the First Amendment's bar on con-

tent-based speech bans. Outside the courtroom, both the Comptroller at the time (the defendant) and the Attorney General (the defendant's counsel) repeatedly expressed concerns about the Act's legality.

Relying first on the TIA, the district court concluded that it could consider only appellants' challenge to the Act's speech ban. But as a century of precedent makes clear, the TIA bars pre-enforcement review in federal court only when a plaintiff challenges a "classic" tax, not a punitive fee. Relying on mootness, the district court later concluded that it could not consider *any* element of this case. But while appellants are happy to see that a Maryland state court has confirmed some of the Act's many legal flaws, that decision did not address the speech ban, which has ongoing importance to businesses that have already paid assessments under the Act and must decide what they can communicate to their customers about cost increases. Moreover, the decision is the subject of an appeal, and the State has indicated it may continue enforcing the Act in the meantime.

The district court should have resolved the merits of appellants' claims and entered final judgment in their favor. This Court should reverse and remand with instructions to do so.

## JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction under 28 U.S.C. § 1331 and entered final judgment on December 12, 2022. *See* JA438. Appel-

lants noticed an appeal on December 13, 2022. JA439. This Court's jurisdiction rests on 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

**1.** Did the district court err in dismissing the case as moot, despite the admitted existence of a continuing Article III controversy?

**2.** Does that Act's pass-through provision (Md. Tax-Gen. § 7.5-102(c)) violate the First Amendment to the U.S. Constitution?

**3.** Did the district court err in dismissing appellants' pre-enforcement challenge to the Act's levy as barred by the Tax Injunction Act?

## STATEMENT

### A.    The Digital Advertising Gross Revenues Tax Act

#### *1.    Enactment of the Act*

In the months prior to introduction of the Maryland Digital Advertising Gross Revenues Tax Act, NYU Professor Paul Romer published an op-ed in the *New York Times* accusing Google, Facebook, and other "dominant social media platforms" of "mak[ing] their profits using business models that erode" the "shared values and norms on which democracy depends." Paul Romer, *A Tax That Could Fix Big Tech*, N.Y. Times (May 6, 2019), https://perma.cc/MZ83-NF5Y (*Romer Op-Ed*). The letter described large digital advertising companies as "too big to trust" and blamed them for creating "a haven for dangerous misinformation and hate speech." *Id.* Romer called upon

3

States like Maryland to impose a "surcharge" or "penalty" on digital adver-
tisers to punish them. *Id.*

Maryland lawmakers answered the call, introducing the Act in January
2020. *See* JA23 (¶ 45) (Senate President Bill Ferguson testifying that the
law "is based off a model originally built by Paul Romer"). The General
Assembly passed the Act in March 2020. Governor Hogan vetoed the bill,
but the Assembly overrode the veto and amended the Act in the next legisla-
tive session, in February 2021. JA13-18 (¶¶ 1, 4, 5, 26).

### 1.    *The Act's provisions*

As amended, the Act imposes a graduated charge on "digital advertis-
ing services," but not on advertising services through other means. Tax-Gen.
§ 7.5-101. "Digital advertising services" are defined as "advertisement ser-
vices on a digital interface, including advertisements in the form of banner
advertising, search engine advertising, interstitial advertising, and other
comparable advertising services." *Id.* § 7.5-101(e)(1). A "digital interface" is
"any type of software, including a website, part of a website, or application,
that a user is able to access." *Id.* § 7.5-101(f).

The Act exempts from this charge "advertisement services on digital
interfaces owned or operated by or on behalf of a broadcast entity or news
media entity." *Id.* § 7.5-101(e)(2). A broadcast entity is one "primarily
engaged in the business of operating a broadcast television or radio station"

4

(*id.* § 7.5-101(d)), and a news media entity is one "engaged primarily in the business of newsgathering, reporting, or publishing articles or commentary," other than aggregators (*id.* § 7.5-101(g)).

The Act's charge is assessed against "annual gross revenues derived from digital advertising services in the State." Tax-Gen. § 7.5-102(b)(1). The rate at which the assessment is imposed is tiered, depending on a payer's "global annual gross revenues" (*id.* § 7.5-103 (emphasis added))—which is to say, on its extraterritorial economic activity:

- for firms with global annual gross revenues of $100 million or more, the Act imposes a 2.5% rate on all assessable revenue;

- for those with $1 billion or more, the Act imposes a 5.0% rate;

- for those with $5 billion or more, the Act imposes a 7.5% rate;

- for those with $15 billion or more, the Act imposes a 10% rate.

*Id.* Thus, a company's overall liability is a function of its out-of-State conduct. JA20 (¶¶ 36-37); JA31 (¶ 85). For example, if two firms both had $5 million of in-State revenue, but the first firm had $100 million in out-of-State revenue and the second had $1 billion in out-of-State revenue, the second firm will pay *double* the assessment of the first firm.

Each company that "reasonably expects . . . annual gross revenues derived from digital advertising services in the state to exceed $1,000,000" in a given year must file "a declaration of estimated tax, on or before April 15

of that year." Tax-Gen § 7.5-201(b)(1). Such companies must also submit quarterly estimated payments. *Id*. § 7.5-201(b)(2).

### 2.    *The pass-through provision*

The February 2021 amendment to the law added a pass-through provision. Accordingly, "[a] person who derives gross revenues from digital advertising services in the State may not directly pass on the cost of the tax imposed under this section to a customer who purchases the digital advertising services by means of a separate fee, surcharge, or line-item." Tax-Gen. § 7.5-102(c). In the State's view, the provision is intended to ensure the payers of the exaction, and they alone, bear its burden.

The State stipulated in proceedings below that the pass-through provision "does not prohibit a person . . . from indirectly passing on the cost" of the Act's assessment "by factoring such cost into its customer pricing." JA178. Instead, it applies only when "[t]he cost of the tax . . . is imposed on the customer by means of a 'separate fee, surcharge, or line-item.'" *Id*.

### 3.    *The Act's other unusual characteristics*

By setting such high thresholds for liability, and by excluding broadcast entities and news media firms, the Act's architects precisely targeted "massive technology companies" (JA21 (¶ 39))—those with global footprints and predominantly internet-based business models—to pay the assessment. Just 203 companies of any kind anywhere in the world had

6

2021 annual gross revenue topping $15 billion. *See* Fortune 500, bit.ly/-3wiBi18. Among those, very few derive a sufficiently high level of revenue from digital advertising as to subject them to the Act's penalty. *See* Tax-Gen. § 7.5-201(b)(1); JA21 (¶ 39); JA31 (¶ 85).

An assessment against gross receipts as opposed to net receipts is also highly unusual. Corporate income taxes are traditionally assessed against net income on a flat-rate basis. JA26 (¶ 57). Maryland's corporate income tax rate, for example, is a flat 8.25% assessed against net income. *Id.*; Tax.-Gen. § 10-105(b). Because it applies to gross revenue, by contrast, the Act's surcharge for digital advertising companies is many multiples greater.

For example, a company with $15 billion in global gross revenue and $2 billion in net profits, with 2% of its revenues and profits apportioned to Maryland, would pay a corporate income tax of around $3.3 million on $40 million of Maryland-based pre-tax profit. Under the Act, however, that same company would be liable for an additional $30 million—that is, 10% of 2% of $15 billion. And assessments on gross receipts apply even to unprofitable firms. JA26 (¶ 58).

The proceeds from the Act are not placed in the general treasury. Instead, they are used to pay for administration of the Act, and the remainder is deposited in the "Blueprint for Maryland's Future Fund." Tax-Gen. §§ 2-4A-01, 2-4A-02. The Blueprint Fund is strictly segregated from the

State's general fund, and it is earmarked for specific educational purposes. Educ. § 5-219; JA23 (¶ 46).

The point of devoting the proceeds to the Blueprint Fund is remediation. In Romer's view—and those of the lawmakers that heeded his call—a technology-company "surcharge" is necessary because technology companies have "created a haven for dangerous misinformation and hate speech that has undermined trust in democratic institutions." *Romer Op-Ed* 1. From that perspective, the growth of "[m]assive technology corporations . . . has resulted in negative externalities socialized and borne by the public." JA23 (¶ 45) (quoting testimony of Sen. Ferguson). By placing the proceeds of the Act in the Blueprint Fund, lawmakers effectively were setting them aside to remediate, through education, the perceived "externalities" created by the companies targeted by the Act. JA23 (¶ 46); *accord* Educ. § 1- 302(a)(1) (the Blueprint Fund is intended to provide "students with instruction and skills" to be "productive citizens of the State").

### B.    Procedural background

Shortly after the Assembly overrode Governor Hogan's veto, appellants filed a complaint in district court. They filed an operative amended complaint on April 30, 2021, raising an additional challenge to the pass-through provision.

Count I of the complaint (JA29) alleges that the Act's surcharge is pre-empted by ITFA, which prohibits states from imposing "discriminatory taxes on electronic commerce." 47 U.S.C. § 151 note. Counts II and III (JA30-32) allege that the surcharge violates the dormant Commerce Clause and Due Process Clause because it punishes extraterritorial conduct. Count IV (JA32-33) alleges that the pass-through provision, if interpreted to prohibit companies from including separate fees relating to the Act on invoices, violates the First Amendment.

The State moved to dismiss, arguing that appellants' challenge to the surcharge is barred by the Tax Injunction Act (TIA) and that appellants otherwise fail to state a claim on the merits. Appellants cross-moved for summary judgment, contending that the TIA does not apply to punitive fees like the Act's surcharge, and that they are entitled to judgment on the merits of each claim.

The parties' cross motions became ripe for decision on September 13, 2021. Soon thereafter, the district court held a status conference, at which it ordered supplemental briefing on the applicability of the TIA. This initial supplemental briefing concluded December 13, 2021. By this time, the parties had submitted over 200 pages of merits briefing.

Following an initial oral argument on the cross-motions (JA63), the district court dismissed Counts I-III of the amended complaint. JA144-160.

In just three pages of legal analysis (JA154-156), the court concluded that the Act imposes a tax rather than a fee, and that the TIA thus prevented it from reaching the merits of Counts I-III. But the court held that Count IV was analytically distinct from the surcharge and that the TIA therefore did not apply. JA158-159. It accordingly allowed that claim to proceed.

Over the following nine months, the district court ordered the filing of eight more supplemental merits briefs and held two additional oral arguments on questions relating to the lawfulness of the pass-through provision under the First Amendment.

After the conclusion of supplemental briefing, but before the final oral argument in this case, the Circuit Court for Anne Arundel County, in a parallel state case brought by a distinct group of plaintiffs, declared the Act's levy unlawful. JA273-274. It did not address the pass-through provision. The State has appealed. JA318.

Although the parties agreed that the state-court order does not moot the case, the district court dismissed as moot the challenge to the pass-through provision. JA429-437. The court was unclear whether it dismissed on constitutional or "prudential" grounds. At one point, it reasoned that if it were to decide appellants' challenge to the pass-through provision, it would be issuing an "advisory opinion," which it described as off-limits under "Article III of the Constitution." JA435. But at another point, the court sug-

gested it was relying on its "discretionary power" to dismiss the case as "moot for prudential reasons." JA433-434. In the end, the court simply dismissed "for lack of subject matter jurisdiction." JA438.

Following its mootness decision, the district court entered a final judgment. JA438. The judgment dismisses Count IV of the complaint (the challenge to the pass-through provision) "*WITHOUT* PREJUDICE for lack of subject matter jurisdiction" but Counts I-III (the challenges to the surcharge) "*WITH* PREJUDICE for lack of subject matter jurisdiction." *Id.* (emphasis added). The judgment included no further reasoning.

## SUMMARY OF THE ARGUMENT

**I. A.**  The Court should reverse and remand with instructions to enter judgment for appellants on the challenge to the pass-through provision.

Count IV is not constitutionally moot. The state court judgment did not declare the pass-through prohibition to be unlawful, and the State has taken the position that it may continue enforcing it. Meanwhile, more than $100 million in estimated payments under the Act have been made. Payers of those remittances are actively being chilled from stating the fact and magnitude of price increases attributable to the Act on customer invoices and account statements. Count IV thus plainly remains live.

Count IV also is not prudentially moot. Prudential mootness is a doctrine of questionable validity; if it is valid at all, it may be invoked only spar-

ingly. The district court here was capable of entering relief with substantial and concrete utility to appellants' members, and it should have done so.

**I. B.**  Because appellants' challenge to the pass-through provision is not moot and presents a purely legal question, the Court should hold that the provision violates the First Amendment. The State has stipulated that the pass-through provision does not prohibit entities from raising prices to recoup the Act's assessment from customers. Instead, the provision bars companies from identifying price increases attributable to the Act as a surcharge or line item on account statements. That is a simple content-based speech ban. And the speech covered by the provision is political speech; if it were not banned, its purpose would be to assign responsibility for rising prices to the government, holding lawmakers accountable for misguided policies. It is presumptively unlawful and does not satisfy strict scrutiny.

Nor would the pass-through provision satisfy intermediate scrutiny even if the speech at issue were deemed commercial speech. Prohibitions on truthful, non-misleading commercial speech are subject to special scrutiny, and they pass muster only if they are appropriately tailored to a substantial governmental interest. The State here has not identified an interest that meets that requirement, and the provision would not be necessary to achieve any such objective regardless. Every court to confront a similar pass-through

12

provision has held that it flunks whatever level of scrutiny applies and must be facially invalidated. The provision here must meet the same fate.

**II. A.** The Court should also reverse the district court's dismissal of Counts I-III and remand for further proceedings on those counts. To begin, Counts I-III are not moot for the same reason that Count IV is not: The State has appealed the state-court judgment. What's more, the state court declared the Act unlawful without enjoining enforcement, which the State has indicated it may yet undertake. Mootness is no basis for dismissal.

**II. B.** Nor are Counts I-III barred by the Tax Injunction Act, which forecloses prospective federal-court review of state tax laws. The word "tax" has specialized meaning under the TIA, not reflecting contemporary common usage. While it covers "classic" taxes levied against wide populations for deposit in the general treasury for open-ended use, it does not cover governmental assessments that have principally punitive functions.

Several facts confirm that the assessment here is a punitive fee: It is remarkably onerous, so much so that it could more than wipe out a payer's profits on its in-State commercial activity; it is narrowly targeted, especially at its highest rates of assessment, which deliberately apply to just a handful of companies; it includes a pass-through prohibition, which was meant to ensure that the payers of the charge alone bear its brunt—a limitation that courts have found inherently punitive; its proceeds are placed in a segregated

13

fund earmarked to offset the perceived negative "externalities" of the pay-ers' conduct, akin to a restitution payment; and the legislative history shows that the Act's architects intended to punish large multinational companies for allegedly harming the free flow of information over the internet.

The district court disregarded these characteristics, concluding that the Act assesses a classic tax because it raises revenue for the "general wel-fare" from "many" payers. That conclusion disregards the uncontested facts and settled caselaw, which uniformly support the opposite conclusion. The TIA dismissal thus must be reversed.

**III.**    The Court must at minimum remand with instructions to modify the judgment. If the Court were to affirm the mootness decision, it would have to remand with instructions to vacate the district court's prior TIA decision. And if the Court were to reverse the mootness decision but affirm the TIA decision, it would have to remand with instructions to enter judg-ment *without* prejudice as to Counts I-III.

## STANDARD OF REVIEW

This Court reviews a district court's dismissal for lack of jurisdiction *de novo*. *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017) (mootness); *GenOn Mid-Atlantic v. Montgomery County*, 650 F.3d 1021, 1023 (4th Cir. 2011) (Tax Injunction Act).

## ARGUMENT

This appeal presents a live controversy in which federal-court relief would have real and immediate utility. The district court's decision to dismiss the case as moot is indefensible. The Court should reverse that decision and remand with instructions to enjoin enforcement of the pass-through provision immediately. The Court also should reverse the district court's TIA holding and remand with instructions for the district court to resolve the merits of Counts I-III of the complaint in the first instance.

## I.  THE COURT SHOULD HOLD THAT THE PASS-THROUGH PROVISION VIOLATES THE FIRST AMENDMENT (COUNT IV)

### A.  The challenge to the pass-through provision is not moot

The district court incorrectly dismissed Count IV as moot. This Court has recognized two versions of the mootness doctrine—a constitutional version and a prudential one. Neither one justifies the outcome below.

#### 1.  *The challenge to the pass-through provision is not moot in the Article III sense*

Constitutional mootness "is a limitation on federal judicial power grounded in the 'case-or-controversy' requirement of Article III of the U.S. Constitution." *United States v. Springer*, 715 F.3d 535, 540 (4th Cir. 2014). "[A] suit becomes moot" in this sense "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (cleaned up) (quoting *Already,*

*LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). A case is no longer live "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Service Employees International Union*, 567 U.S. 298, 307 (2012) (internal quotation marks omitted). Thus, "[t]he mootness doctrine" is in actuality "a relatively weak constraint on federal judicial power." *Springer*, 715 F.3d at 540. "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984).

**a.** Appellants' challenge to the pass-through provision is not moot under these standards. It is beyond contestation that a merits decision in a first case does not moot a second case when the second involves additional claims not reached in the first. *See* 13B Fed. Prac. & Proc. Juris. § 3533.2.1 (3d ed. 2022) ("Wright & Miller") (a judgment in one lawsuit "that grants part but not all of the relief sought" in another lawsuit "does not moot the demand for additional relief" in the other lawsuit).

Here, the state court entered judgment for the plaintiffs in that case only on counts one, six, and eight of their complaint (JA313):

Accordingly, it is hereby

ORDERED, ADJDGED, ADJUDICATED, and DECREED that the:

Maryland Digital Advertising Gross Revenues Tax violates the Supremacy Clause of the United States Constitution and the Internet Tax Freedom Act (Count One), the dormant Commerce Clause of the United States Constitution (Count Six), and the First Amendment to the United States Constitution (Count Eight).

So Ordered, this 17th day of November, 2022.

Judge Alison L. Asti
Circuit Court for Anne Arundel County

Each of those three counts challenged the Act's levy; none challenged the pass-through provision. Only counts ten and eleven of the state-court complaint challenged the pass-through provision (JA307-310), and those counts were dismissed without prejudice by stipulation of the parties. *See* JA315. The state court thus did not address the merits of the pass-through provision, declare it unlawful, or enjoin its enforcement.

In short, the pass-through provision remains entirely unaffected by the state-court decision. Indeed, the State's own filings in the state-court appeal confirm that the challenge to the pass-through provision remains live. In its motion for a stay pending appeal, the State acknowledged that payers already have remitted more than $100 million to the Comptroller under the Act. Stay Motion 3, *Comptroller v. Comcast of California/Maryland/Pennsylvania/Virginia/West Virginia LLC*, S. Ct. Md. No. 22-327 (Dec. 27, 2022), https://-

17

perma.cc/W7GN-FEDZ ("Stay Motion"). Meanwhile, the pass-through provision continues to bar appellants' members—many of whom continue to make estimated payments in anticipation of a possible appellate reversal—from conveying truthful, non-misleading facts about those remittances in customer communications like invoices and statements. The case therefore remains "live" (*Chafin*, 568 U.S. at 172), and it is not "impossible" for the Court "to grant any effectual relief whatever" (*Knox*, 567 U.S. at 307) to appellants on Count IV of the complaint.

**b.** Even if the state court had reached the pass-through provision, the pendency of the State's appeal from the state-court order ensures that the controversy remains live. JA318. Authorities are clear that when similar legal challenges are litigated in parallel cases, and the trial court in the first case grants relief, the second case is not rendered moot as long as the decision in the first case remains "subject to reopening or appeal." 13B Wright & Miller § 3533.2.1; *see id.* ("Action by another tribunal in related proceedings does not always moot a pending action."). That was this Court's conclusion in *North Carolina State Conference of the NAACP v. Raymond*, 981 F.3d 295 (2020), where it held that it could not "presume" the outcome of further state-court proceedings after a state court in parallel litigation had entered a preliminary injunction. *Id.* at 301-302. There accordingly would be no ground for holding that appellants' challenge to the pass-through prohibition

is constitutionally moot even if the state court had reached the merits of the plaintiffs' challenge to the pass-through prohibition.

Notably, the State did not disagree with these points in proceedings before the district court. It took the position, instead, that "[t]he ruling issued by the Circuit Court for Anne Arundel County . . . does not affect the ability of [the district court] to adjudicate this case." JA275. And at oral argument, counsel for the State noted that the case law "does not reveal any case that holds that a state trial-level decision that's pending appeal compels a federal court to dismiss a related action." JA328. Those statements were correct, and the parties thus agree that this case is not moot in the constitutional sense.

### 2. *The challenge to the pass-through provision is not prudentially moot*

Nor does prudential mootness justify dismissal of Appellants' challenge to the pass-through provision. As an initial matter, prudential mootness is a doctrine that has been narrowed significantly by the Supreme Court in recent cases. And dismissal here for prudential reasons would not be justified even under this Court's older precedents.

**a.** To begin, prudential mootness—which, like other doctrines of prudential justiciability, purports to allow federal courts to decline jurisdiction as a matter of discretion—is today a doctrine of questionable vitality. *See,*

*e.g.*, *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 596 n.3 (6th Cir. 2014) ("In several recent cases, the Supreme Court . . . has placed the continuing vitality of the prudential aspects of standing and ripeness, [which] are closely related to mootness, in doubt."); *In re Continental Airlines*, 91 F.3d 553, 567 (3d Cir. 1996) (en banc) (Alito, J., dissenting) (questioning the validity of the "curious doctrine of 'equitable mootness'").

It has been settled since the Founding Era that federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (Marshall, C.J.); *accord Spann v. Martin*, 963 F.2d 663, 673 (4th Cir. 1992) ("The district court has a duty to decide cases within its jurisdiction."). The Supreme Court accordingly has recognized that a dismissal based on prudential non-justiciability is "in some tension" with the settled rule that "a federal court's obligation to hear and decide" cases over which it has jurisdiction "is virtually unflagging." *Lexmark International v. Static Control Components*, 572 U.S. 118, 126 (2014) (quotation marks omitted) (quoting *Sprint Communications v. Jacobs*, 571 U.S. 69, 77 (2013)).

In recent cases, the Court thus has pared back on prudential justiciability. In *Lexmark*, the Court limited federal courts' discretion to dismiss cases for lack of "prudential standing," explaining that two of the principal circumstances in which courts have applied that doctrine "d[o] not belong"

20

under "the 'prudential' rubric" at all. 572 U.S. at 126-127. In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), the Court reversed the Sixth Circuit's dismissal for lack of "prudential ripeness," again calling into question the "continuing vitality" of the doctrine. *Id.* at 167. And in *Sprint*, the Court held presciently that federal courts "have no . . . right to decline the exercise of jurisdiction" when they have it, and "[p]arallel state-court proceedings do not detract from that obligation." 571 U.S. at 77.

The thrust of these recent cases is that, if prudential limitations on justiciability remain valid at all, they are applicable only in exceptional circumstances. Certainly, a federal court may not dodge the merits of a case properly before it simply because it would prefer not to decide.

**b.** Forty years ago, this Court identified a number of factors that bear on prudential mootness. *S-1 v. Spangler*, 832 F.2d 294 (4th Cir. 1987). Only the first "and most fundamental[]" factor (*id.* at 297) is relevant here. It asks whether "[t]he specific relief sought . . . no longer has sufficient utility to justify decision." *Id.* That cannot be said here.

Again, companies subject to the Act have paid substantial estimated taxes under the Act. Stay Motion 3 (collections of more than $100 million under the Act in 2022). And the pass-through provision continues to bar appellants' members from including a "separate fee, surcharge, or line-item" that attributes corresponding price increases to those payments. Tax-Gen.

21

§ 7.5-102(c). The result is "self-censorship, which occurs when a claimant is chilled from exercising [the] right to free expression" because of an express legal prohibition. *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)). A federal declaratory judgment that the pass-through provision is unlawful thus would have significant and immediate utility.

"The only conceivable basis for a finding of mootness" on prudential grounds in circumstances like these would be to conclude that the State, by its "voluntary conduct," will not enforce the law. *Friends of the Earth v. Laidlaw Environmental Services (TOC)*, 528 U.S. 167, 189 (2000). But "a defendant claiming that its voluntary [cessation]" warrants dismissal "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id* at 190 (citing *United States v. Concentrated Phosphate Export Association*, 393 U.S. 199, 203 (1968)).

That burden has not been met here. On the contrary, the State explicitly disavowed voluntary cessation at the last hearing before the district court, insisting that the pass-through provision "could be enforced." JA327. And it is vigorously appealing the state-court judgment. Moreover, the State did not raise voluntary cessation or seek dismissal on that ground—which matters, because a dismissal based on voluntary cessation is waivable. *See June Medi-*

22

*cal Services LLC v. Russo*, 140 S. Ct. 2103, 2117 (2020) (clarifying that "prudential" limitations on justiciability do "not involve the Constitution's 'case or controversy requirement'" and so "can be forfeited or waived").

Extension of prudential mootness to these facts—where the case is obviously still live in the constitutional sense, entry of judgment would have substantial practical utility, and the State has not asked for a prudential dismissal—would greatly expand a disfavored doctrine, offending recent Supreme Court precedent and Article III itself. The district court's dismissal of Count IV on mootness grounds accordingly should be reversed.

### B.   The pass-through provision violates the First Amendment

Because the unconstitutionality of the pass-through provision under the First Amendment is an urgent and purely legal issue, the Court should reach the merits of Count IV and hold that the pass-through provision violates the First Amendment. When a district court has erroneously dismissed a claim as moot, and when "the question is purely a legal one, a remand is unnecessary and this court will reach the constitutional question." *Perry v. Bartlett*, 231 F.3d 155, 160 (4th Cir. 2000).

### 1. The pass-through provision is a content-based ban on political speech

The First Amendment doctrine at issue here is straightforward. Under the Free Speech Clause, as incorporated against the States by the Fourteenth Amendment, state governments have "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Board*, 502 U.S. 105, 115 (1991)). The pass-through provision falls within that description and is therefore presumptively invalid under the First Amendment.

**a.** To begin, the Act's pass-through provision is a ban on speech, not conduct. It specifies in relevant part that an entity subject to the Act's charge "may not directly pass on the cost . . . to a customer . . . by means of a separate fee, surcharge, or line-item." Tax-Gen. § 7.5-102(c). The State has stipulated that this language does *not* prohibit such an entity from "indirectly passing on the cost" of the Act's levy "by factoring such cost into its

24

customer pricing." JA178. The provision thus does not regulate customer pricing or forbid parties from recouping the cost of the Act's assessment.

Instead, the pass-through provision regulates what companies may *say* to their customers on invoices. It forbids companies from stating an express "fee, surcharge, or line-item" that identifies with particularity the fact and magnitude of the price increase attributable to enactment of the Act. That is to say, the provision does not "regulate[] the amount a [taxpayer] can collect" from customers (it can collect what it likes); it only "regulates how sellers may communicate their prices" on invoices, billing statements, and the like. *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1146 (2017). That is a ban on speech, not conduct. *Id.*

The pass-through provision is thus indistinguishable from the prohibition invalidated by the Sixth Circuit in *BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499 (2008). There, Kentucky imposed a tax on telecommunications providers. Like Maryland here, Kentucky prohibited those providers from "separately stat[ing] the tax on [a customer's] bill." *Id.* at 500. Observing that the State "has no objection to the providers' conduct (raising prices to account for the new tax), just its speech (saying why it has raised prices)," the Sixth Circuit held that the provision "regulates speech, not conduct." *Id.* at 506. Just so here.

25

In proceedings below, however, the State continued to insist, even after the parties' joint stipulation (JA178), that the ban regulates conduct and not speech. Yet it has not once offered a coherent explanation for that position. And a few simple examples readily prove it wrong. Each of the following three invoices, for instance, would be unlawful according to the plain language of the pass-through provision:

**ACME DIGITAL ADVERTISING**
**INVOICE – February 1, 2022**

January 2022 advertising services: $900
Maryland Digital Advertising Tax recoupment fee: $100

Total due: $1000

**SMITH & SONS DIGITAL ADVERTISING CO.**
**INVOICE – February 1, 2022**

Total due for January 2022 advertising services: $1000*
*\* Includes a 10% surcharge for the Maryland Digital Advertising Tax, which will be remitted to Comptroller of Maryland pursuant to Md. Tax-Gen. § 7.5-102.*

**DIGITAL MARKETING OF AMERICA**
**INVOICE – February 1, 2022**

Advertising services, 1/1/22 thru 1/31/22: $1000
*Please note: Your total includes a $100 fee to pay the Maryland Digital Advertising Tax.*

Yet the same companies, charging the same prices for the same services, would comply with Section 7.5-102(c) by censoring their written speech:

**ACME DIGITAL ADVERTISING**
**INVOICE – February 1, 2022**

January 2022 advertising services: ~~$900~~ $1000
~~Maryland Digital Advertising Tax recoupment fee: $100~~

Total due: $1000

26

**SMITH & SONS DIGITAL ADVERTISING CO.**
**INVOICE – February 1, 2022**

Total due for January 2022 advertising services: $1000*
~~* Includes a 10% surcharge for the Maryland Digital Advertising Tax, which will be remitted to Comptroller of Maryland pursuant to Md. Tax-Gen. § 7.5-102.~~

**DIGITAL MARKETING OF AMERICA**
**INVOICE – February 1, 2022**

Advertising services, 1/1/22 thru 1/31/22: $1000
~~Please note: Your total includes a $100 fee to pay the Maryland Digital Advertising Tax.~~

A regulation that censors the truthful, non-misleading communication of information like this is not a permissible regulation of conduct; it is an impermissible regulation of speech.

**b.** The pass-through provision is not just a speech ban; it is a *content-based* speech ban. "[T]he phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163. More simply put, a law is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.*

The pass-through provision is just such a law. An invoice that does *not* expressly attribute increased advertising costs to the Act through an express fee or line-item is lawful. But an invoice that *does* make that attribution—one that identifies the fact and magnitude of the price increase attributable to the Act and assigns responsibility for it to elected officials through an expressly-

stated "fee, surcharge, or line-item" to recoup the Act's assessment (Tax-Gen. § 7.5-102(c))—is prohibited and subject to punishment. Without doubt, distinguishing between a permissible and impermissible invoice requires an analysis of "the message [the] speaker conveys." *Reed*, 576 U.S. at 163. The law thus plainly "targets speech based on its communicative content—that is, it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan National Advertising*, 142 S. Ct. 1464, 1471 (2022) (cleaned up) (quoting *Reed*, 576 U.S. at 163).

**c.** Making matters still worse for the State, the prohibited speech is *political* speech, which is subject to the highest and most urgent protections of the First Amendment. As the Sixth Circuit has explained, a pass-through provision like this one forbids payers of the Act's assessment from "announcing who bears political responsibility" for the new charge in the "forum most likely to capture voters' attention: an invoice that displays a predictable consequence of the tax." *BellSouth*, 542 F.3d at 505. A line-item identifying a separate amount attributable to the Act allows a company to communicate to its customers the reason for rising prices—it conveys that a price increase is not the result of economic opportunism by the company, but the ill-conceived actions of elected officials.

Congress has recognized the importance of this kind of speech in related contexts. For example, in its regulation of cable operators, Congress has

specified that local regulators may not prohibit the identification "as a separate line item on each regular bill of each subscriber" of "[t]he amount of the total bill assessed as a franchise fee and the identity of the franchising authority to which the fee is paid." 47 U.S.C. § 542(c)(1). The purpose of this provision is "to inform subscribers that local elected officials are imposing franchise fees so that there will be a measure of accountability for fees and fee increases." Mem. Op. & Order, *The City of Pasadena, Cal., et al.*, Petitions for Declaratory Ruling, 2001 WL 1167612, ¶ 23 (FCC Oct. 4, 2001), *petitions for review denied*, *Texas Coal. of Cities for Utility Issues v. FCC*, 324 F.3d 802 (5th Cir. 2003).

The point of "subscriber bill itemization [is] to give the cable companies an opportunity to itemize these so-called hidden costs, to explain to the people" why prices are rising, so they "will know it is not just the cable company jacking up the prices" but excessive "taxes which the cable has to pay." 138 Cong. Rec. S561-02, S569 (daily ed. Jan. 29, 1992) (statement of Sen. Lott). The pass-through provision muzzles that kind of speech here, permitting elected officials who are in fact responsible for increased prices to "duck political responsibility." *BellSouth*, 542 F.3d at 505.

The freedom to speak on "public issues" and to help "hold officials accountable to the people" is "an essential mechanism of democracy." *Citizens United v. FCC*, 558 U.S. 310, 339 (2010); *accord Garrison v. Louisiana*,

379 U.S. 64, 74-75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). This is particularly true for the government's power to tax, for which the primary security against abuse is democratic accountability: "A State's constituents can be relied on to vote out of office any legislature that imposes an abusively high tax on them." *United States v. Fresno County*, 429 U.S. 452, 458-59 (1977).

**d.** Before the district court, the State contended that if the pass-through provision does regulate speech, it is only "commercial" speech, as to which a lower level of scrutiny applies. That is not so. The Supreme Court has defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 561 (1980). It is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). The Supreme Court has therefore identified the proposal of a commercial transaction—for example, "I will sell you the X prescription drug at the Y price" (*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 761 (1976))—as "the core notion of commercial speech" (*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66 (1983)).

That does not describe the speech regulated by the pass-through provision. A line-item expressly identifying the fact and magnitude of the digital-

advertising surcharge is a statement assigning political responsibility for the cost to the State rather than the service provider. It is plainly not a proposal to engage in a commercial transaction.

The fact that the speech at issue here is the speech of a for-profit company conveyed on a document relating to a commercial transaction does not alter that conclusion. A company can express its support for a particular electoral candidate or for particular legislation; such speech is not rendered "commercial" for First Amendment purposes merely because it is the speech of a for-profit company appearing on an invoice or account statement, rather than on a leaflet, billboard, or website.

### 2. *The pass-through provision fails any level of scrutiny*

**a.** As a content-based restriction on political speech, the pass-through provision is "presumptively unconstitutional." *Reed*, 576 U.S. at 163. It may be sustained "only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Id.* But there is no chance that this "is the rare case" in which such a law can withstand such scrutiny. *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (plurality opinion).

To establish a compelling interest, the State would have to (1) identify an interest that is "some pressing public necessity, some essential value that has to be preserved" (*Turner Broadcasting Systems v. FCC*, 512 U.S. 622, 680 (1994) (O'Connor, J., concurring)) and (2) show that preservation of

31

that compelling value was the legislature's "actual purpose" for the law and not a post hac rationalization (*Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996)).

Setting aside any interest the State may have in the Act's "tax," nothing in the text of the Act or in the legislative history indicates a compelling interest for the accompanying speech ban. The legislative history indicates that the purpose of the pass-through provision was to ensure that the tax is borne by large digital advertising companies, and not by others. But wishing to ensure that disfavored speakers bear the brunt of a punitive government levy is not a legitimate, let alone compelling, interest for a speech ban. *See Citizens United*, 558 U.S. at 341 ("[I]n the context of political speech, the Government may [not] impose restrictions on certain disfavored speaker").

Nor would the prohibition be narrowly tailored even if punishment were a compelling governmental interest in this context. There are "plausible, less restrictive alternative[s]" (*United States v. Playboy Entertainment Group*, 529 U.S. 803, 816 (2000)) to punishing the targeted companies apart from silencing their words. Again, the State has not argued otherwise. The provision readily fails strict scrutiny, and it must be invalidated.

**b.** Even if the speech at issue here could be characterized as commercial rather than political speech, and thus subject to *Central Hudson* scrutiny, the law would still be unconstitutional.

Under *Central Hudson*, "bans against truthful, nonmisleading commercial speech," such as the one at issue here, are evaluated with "special care" and "rarely survive constitutional review." *44 Liquormart v. Rhode Island*, 517 U.S. 484, 504 (1996) (plurality) (quoting *Central Hudson*, 447 U.S. at 566 n.9). That is because "bans that target truthful, nonmisleading commercial messages rarely protect consumers from" deceptive commercial speech; instead, "such bans often serve only to obscure an underlying governmental policy . . . [and] impede debate over central issues of public policy." *Id.* at 502-503 (cleaned up).

That is the case here: The pass-through prohibition censors truthful, non-misleading speech that otherwise would bring attention to misguided tax policies for which lawmakers wish to avoid accountability. It does not come close to surviving *Central Hudson*.

*Central Hudson*'s first prong requires the Court to "ask whether the asserted governmental interest is [a] substantial" one. *Educational Media Co. at Virginia Tech v. Insley*, 731 F.3d 291, 299 (4th Cir. 2013) (quoting *Central Hudson*). Not just any governmental interest will do—*Central Hudson*, after all, calls for more than mere "rational-basis review." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993). Moreover, the State bears the burden here, and "mere speculation or conjecture" is not enough; the State "must demon-

strate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id*. at 770-771.

But again, the State's interest in ensuring that the tax is borne by large digital advertising companies alone is not a substantial one. Nor does the provision advance that interest in any event. The State has conceded (JA178) that payers of the levy *may* pass it on to customers with price increases. All the pass-through prohibition accomplishes is to prevent them from telling customers *why* their bill has increased and by how much.

Courts have repeatedly invalidated similar measures prohibiting companies from stating taxes and fees imposed by the government as line-items on bills to customers. *See, e.g., BellSouth*, 542 F.3d at 506-10 (Kentucky law prohibiting telecommunications providers from separately identifying a tax on bills violated First Amendment); *AT&T Corp. v. Rudolph*, 2007 WL 647564, at *1, *13 (E.D. Ken. Feb. 27, 2007) (Kentucky law prohibiting companies from collecting tax "directly from purchasers" by "separately stating the tax on the bill to purchasers" violated First Amendment); *Bloom v. O'Brien*, 841 F. Supp. 277, 280-281 (D. Minn. 1993) (Minnesota law prohibiting healthcare providers from itemizing gross revenue tax on patient's bill likely violated First Amendment). This Court should do the same.

### 3. *The pass-through provision is facially invalid*

Facial invalidation of the pass-through provision is appropriate in this case because "no set of circumstances exists under which [the law] would be valid." *Greater Baltimore Center for Pregnancy Concerns v. Mayor & City of Baltimore*, 721 F.3d 264, 282 (4th Cir. 2013) (quoting *United States v. Stevens*, 559 U.S. 460, 472-473 (2010)). Whenever the provision applies, it restricts speech based on its content—and it does so without being appropriately tailored to any sufficiently weighty state interest, regardless the level of scrutiny applied.

As other courts have held, "where a statute fails the relevant constitutional test," the law cannot ever "be constitutionally applied to anyone—and thus there is 'no set of circumstances' in which the statute would be valid." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012); *accord Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016). That is why the uniform outcome in a challenge to speech bans like this is facial invalidation. *See, e.g.*, *United States v. Alvarez*, 567 U.S. 709 (2012); *Brown v. Entertainment Merchants Association,* 564 U.S. 786 2011); *Citizens United,* 448 U.S. at 365-366; *United States v. Playboy Entertainment Group*, 529 U.S. 803, 811-827 (2000); *44 Liquormart*, 517 U.S. at 516; *Central Hudson*, 447 U.S. at 572; *R.A.V.*, 505 U.S. at 391. This case is no exception.

35

### C.  No further proceedings on Count IV are warranted

Immediate resolution by this Court of Count IV is both appropriate and important. It is appropriate because the First Amendment violation here is both clear and purely legal. In these circumstances, "a remand is unnecessary and this court [should] reach the constitutional question." *Perry*, 231 F.3d at 160.

It is important because the pass-through provision is chilling speech, contravening First Amendment values. Appellants filed this suit nearly two years ago, and no federal court has yet to pass on the merits of their claims. In the meantime, appellants' members have been paying (and many will continue to pay) estimated taxes under the Act. It is essential that they obtain clarity on the question whether the First Amendment protects their right to attribute price increases to the Act using line-items and express surcharges. The district court is no better positioned than this Court to answer that question, and further delay and would perpetuate the First Amendment harms implicated. The Court should thus rule for appellants on Count IV now.

## II.  THE COURT SHOULD REVERSE THE DISMISSAL OF COUNTS I-III AND REMAND FOR FURTHER PROCEEDINGS

Earlier in the proceedings below, the district court dismissed appellants' challenges to the levy itself (Counts I-III) as barred by the Tax Injunction Act. That, too, was reversible error. Because Counts I-III, like Count IV,

are not moot, and because the TIA is no bar to this suit, the district court should have reached and resolved the merits of these claims.

### A.    Counts I-III are not mooted by the state court order

Although the district court held only Count IV moot, its reasoning may be understood to extend to the entire case. But Counts I-III are not moot, for the same reason that Count IV is not moot: The State has appealed. *See supra* 18-19; 13B Wright & Miller § 3533.2.1; JA318.

They are also not moot because the state court judgment only *declared* the Act's assessment unlawful; it did not *enjoin* its enforcement. The State thus argued before the district court in this case that, in the absence of an injunction that explicitly restrains enforcement of the Act, the Comptroller may continue enforcing the Act. *See* JA326-327 (oral argument). Unsurprisingly, the State has not instructed payers of the Act's levy that they may cease or withhold estimated payments, and many are continuing to make estimated payments under the Act to avoid possible penalties and interest for failure to do so. *See* JA 339 (oral argument). It therefore is not "*impossible* for [the district] court to grant any effectual relief whatever" with respect to Counts I-III; even if enforcement of the Act is now less probable than it initially was, "improbability and impossibility are not the same thing." *Raymond*, 981 F.3d at 302.

The scenario here is also common. Courts routinely consider overlapping challenges to the same laws in parallel lawsuits, and it's rote that an appealable judgment in one case does not moot the other case. For example, compare *International Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570 (D. Md. 2017) (granting nationwide injunctive relief in October 2017) with *Hawai'i v. Trump*, 241 F. Supp. 3d 1119 (D. Haw. 2017) (granting same nationwide relief months earlier, in March 2017). Again, the State did not argue otherwise below; the parties agree that this case is not moot.

### B.      Counts I-III are not barred by the TIA

Counts I-III are not barred by the TIA, which ordinarily bars pre-enforcement judicial review of state taxes in federal court. 28 U.S.C. § 1341. As demonstrated below, the word "tax" has a unique meaning under the TIA based on more than 130 years of judicial precedent. It excludes state exactions imposed for principally punitive purposes. And numerous features of the Act's surcharge here indicate that it falls within that excluded category. The district court was thus wrong to dismiss Counts I-III on TIA grounds.

#### 1.      *The TIA applies to "classic" taxes, not to punitive fees*

**a.** Enacted in 1937, the TIA provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The TIA's language "was modeled

on the Anti-Injunction Act," which is the federal-tax analogue of the TIA. *Direct Marketing Association v. Brohl*, 575 U.S. 1, 8 (2015). Because the TIA and AIA are so closely related, the Supreme Court has long "assume[d] that words used in both Acts are generally used in the same way." *Id.* Courts also have traditionally given weight under the TIA to contemporaneous cases construing the meaning of "tax" under the Tax Clause. *See, e.g.*, *NFIB v. Sebelius*, 567 U.S. 519 (2012); *Bidart Bros. v. California Apple Commission*, 73 F.3d 925, 931 (9th Cir. 1996).

At the time of the TIA's enactment in 1937, the Supreme Court had drawn a clear distinction between "taxes" on the one hand (to which the AIA and Tax Clause applied) and "penalties" and "fees" on the other hand (to which the AIA and Tax Clause did *not* apply). *See, e.g.*, *Graham v. Dupont*, 262 U.S. 234, 258 (1923). As early as 1922, the Court had recognized, in a case concerning the Tax Clause, that taxes may be enacted for the purpose not only "of obtaining revenue" but also "discouraging" and punishing conduct. *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 38 (1922). The Court explained that such assessments generally "do not lose their character as taxes because of the incidental motive" to regulate. *Id.* "But," the Court cautioned, "there comes a time in the extension of the penalizing features of [a] so-called tax when it loses its character as such and becomes a mere penalty, with the characteristics of regulation and punishment" rather than

39

taxation. *Id.* Although "[t]he difference between a tax and a penalty is sometimes difficult to define," the "consequences" of the exaction and "the required method of their collection often are important" to the distinction. *Id.* And, importantly, an exaction may be a "penalty" even when lawmakers do not "expressly declare" that the conduct being assessed "is illegal." *Id.*

Applying this tax/fee distinction in *Lipke v. Lederer*, 259 U.S. 557 (1922), the Court held that an assessment denominated a "tax" by Congress fell outside the reach of the AIA because it "lack[ed] all the ordinary characteristics of a tax" and instead had the "function of a penalty." *Id.* at 562. The Court held similarly in *Regal Drug Corporation v. Wardell*, 260 U.S. 386 (1922), where it recognized "[t]he distinction between a tax and a penalty" for AIA purposes, holding that "even if [an] imposition may be considered a tax, if it [has a] punitive purpose, it must be preceded by opportunity to contest its validity" in federal court. *Id.* at 391-392 (citing *Central of Georgia Railway v. Wright*, 207 U.S. 127 (1907)).

These cases all accorded with the Court's decision in *The Head Money Cases*, 112 U.S. 580 (1884), which, like *Drexel Furniture*, concerned the meaning of "tax" under the Tax Clause. *The Head Money Cases* involved a challenge to a $0.50-per-person fee assessed against shipping companies for each non-citizen passenger they brought to the United States. *Id.* at 586. In holding that the fee was not a "tax," the Court explained that "the real pur-

40

pose and effect of the statute" was to remediate the public cost "inherent in the business of bringing foreigners to this country." *Id.* at 595. The funds raised did "not go to the general support of the government." *Id.* at 596. The proceeds thus "constitute[d] a fund raised from those who are engaged in the transportation of these passengers, and who make profit out of it, for the temporary care of the passengers whom they bring among us, and for the protection of the citizens among whom they are landed." *Id.* It therefore did not qualify as an "ordinary tax," even if "called a tax," because its proceeds were strictly earmarked to offset the costs of externalities of the businesses upon which the exaction was assessed. *Id.*

Thus, by the time the 75th Congress enacted the TIA in 1937—using the word *tax* "in the same way" as the Supreme Court had by then construed it under the AIA (*Direct Marketing*, 575 U.S. at 8) and Tax Clause—there was no question that an assessment with a principally punitive purpose and earmarked for restitutionary programs and not commingled with general government funds was not a "tax" within the meaning of the TIA.

**b.** The analytical framework established in the Supreme Court's early Tax Clause and AIA cases has been carried forward by the courts of appeals, including this Court, in more recent decisions.

These cases recognize that the TIA applies to so-called "classic" taxes, or assessments "imposed by a legislature upon many, or all, citizens" to

"raise[] money, contribute[] to a general fund, and spen[d] for the benefit of the entire community." *San Juan Cellular Telephone Co. v. Public Services Commission of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992) (Breyer, J.); *accord Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000) (citing *San Juan Cellular*). But the TIA does *not* bar pre-enforcement challenges to government assessments with "punitive qualities." *Denton v. City of Carrollton, Georgia*, 235 F.2d 481, 485 (5th Cir. 1956).

Exactions that reflect "punitive purposes" are instead properly classified as fees or penalties, which are "distinguished from a mere 'tax.'" *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 779-780 (1994) (discussing the Tax Clause). In other words, "a tax might be so totally punitive in purpose and effect that, since nomenclature is unimportant, it should be classified as a fine rather than a tax" for TIA purposes, even when denominated by the legislature as a tax. *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 729 (7th Cir. 2011) (en banc) (citing *Lipke*, *Retail Industry Leaders Ass'n v. Fielder,* 475 F. 3d 180 (4th Cir. 2007) (*RILA*), *Denton*, and *Kurth Ranch*).

In this Circuit, when determining whether a particular charge is a punitive fee or a tax "for purposes of the Tax Injunction Act," courts likewise do "not focus on the superficial nomenclature provided to the charge at issue." *GenOn Mid-Atlantic, LLC v. Montgomery County, Maryland*, 650 F.3d 1021,

1023 (2011) (quotation marks omitted) (quoting *Valero*, 205 F.3d at 134). "Instead, [courts] must examine the explicit factual circumstances that transcend the literal meaning of the terminology and ask whether the charge is levied primarily for revenue raising purposes, making it a tax, or whether it is assessed primarily for regulatory or punitive purposes, making it a fee." *Id.* (quotation marks omitted) (quoting same).

"To aid in this determination," the Court has sometimes applied a three-factor test, "for guidance." *GenOn*, 650 F.3d at 1023 (quoting same). At the same time, this Court's "decisions distinguishing between taxes and fees have not always rigorously adhered to the three-factor analytical framework" and have rightly recognized that the distinction turns in the end on "a totality-of-the-facts-and-circumstances test" rather than a "'set of rigid rules or elements [to support] a mechanical conclusion.'" *Norfolk Southern Railway v. City of Roanoke*, 916 F.3d 315, 326-327 (4th Cir. 2019) (Wynn, J., concurring) (collecting cases).

A court considering whether a suit is barred by the TIA therefore must undertake a holistic analysis. As the Court elsewhere has noted, "[v]arious circuit court decisions provide guidance for considering the . . . question[] whether the law is a 'tax' or a 'fee'" under the TIA. *Collins Holding Corp. v. Jasper County*, 123 F.3d 797, 800 (4th Cir. 1997). Those decisions call for consideration of, among other things:

**a)** whether the assessment is unusually harsh or otherwise has functional characteristics distinct from traditional taxes (suggesting a fee)—*see Kurth Ranch*, 511 U.S. at 783; *Denton*, 235 F.2d at 485; *see also Lipke*, 259 U.S. at 562 (assessments "lack[ing] all the ordinary characteristics of a tax" are not likely to be taxes);

**b)** whether the assessment is paid by a broad population (suggesting a tax) or a narrowly-targeted group of payers (suggesting a fee)—*see GenOn*, 650 F.3d at 1024-1025; *Valero*, 205 F.3d at 134; *Bidart Bros.*, 73 F.3d at 931; *San Juan Cellular*, 967 F.2d at 685;

**c)** whether the charge is subject to a pass-through prohibition (suggesting a punitive fee)—*see, e.g.*, *GenOn*, 650 F.3d at 1024-1025; *Consolidated Edison Co. of New York v. Pataki*, 292 F.3d 338, 355 (2d Cir. 2002) (holding that an express "cost-pass-through prohibition is plainly punitive");

**d)** whether the proceeds are deposited in the general treasury for open-ended use (suggesting a tax), or instead set aside in a separate fund and earmarked to fund specific programs (suggesting a fee)—*see, e.g.*, *GenOn*, 650 F.3d at 1023; *RILA,* 475 F.3d at 189; *Collins Holding Corp.*, 123 F.3d at 800; *American Trucking Ass'n v. Alviti*, 944 F.3d 45, 52-53 (1st Cir. 2019) (*American Trucking*); *Travelers Insurance v. Cuomo*, 14 F.3d 708, 713 (2d Cir. 1993); *Trailer Marine Transportation v. Rivera Vazquez*, 977 F.2d 1, 6 (1st Cir. 1992); *San Juan Cellular*, 967 F.2d at 685;

**e)** whether the law's legislative history and the circumstances surrounding its enactment demonstrate a punitive purpose (suggesting a fee)—*see, e.g.*, *GenOn*, 650 F.3d at 1025; *RILA*, 475 F.3d at 189;

**f)** whether the charge is established by a legislatively-adopted statute (suggesting a tax) or is instead established and assessed by a regulatory agency (suggesting a use fee or regulatory fee)—*see Valero*, 205 F.3d at 134; *Norfolk Southern*, 916 F.3d at 319.

These factors together make clear that the word "tax" under the TIA has a specialized meaning that sets it apart from contemporary common usage. As

44

relevant here, it does not include levies with a principal purpose to punish or to extract restitutionary support for programs designed to remediate purported harms caused by the payers' activities.

> **2.    *Under a totality-of-circumstances analysis, the surcharge here is a punitive fee that may be reviewed in federal court***

Evaluated within this framework, the Act's levy is a punitive fee and not a classic tax within the narrow meaning of the TIA. This Court has frequently held exactions like this do not constitute taxes under the TIA. *See GenOn*, 650 F.3d at 1022-1026 (holding that an "exaction on carbon dioxide emissions" was "in substance a punitive and regulatory" charge, not a "tax," within the meaning of the TIA); *RILA*, 475 F.3d at 182, 189 (holding that "payments" for a statewide employee healthcare program, "collected by the Secretary [and] directed to the Fair Share Health Care Fund," were "a quintessential fee or penalty, not a tax" for purposes of the TIA).

Other circuits agree, including the First Circuit in *American Trucking*, *San Juan Cellular*, and *Trailer Marine*, and the Ninth Circuit in *Bidart Brothers*. *See also, e.g.*, *Kathrein v. City of Evanston, Illinois*, 636 F.3d 906, 912 (7th Cir. 2011) (citing *RILA*); *Wright v. Riveland*, 219 F.3d 905, 911-12 (9th Cir. 2000) (citing *San Juan Cellular*, *Trailer Marine*, *Bidart Brothers*, and *The Head Money Cases*).

Because the relevant factors weigh overwhelmingly in this case against application of the TIA and in favor of permitting pre-enforcement judicial review, the same result is warranted here.

### a. The unusual magnitude of the levy and its extraterritorial focus.

An unusually "high rate of taxation" is "consistent with a punitive character." *Kurth Ranch*, 511 U.S. at 780; *accord Korte v. Sebelius*, 735 F.3d 654, 670 (7th Cir. 2013) ("The sheer size of the required payment fairly screams 'penalty.'"); *Denton*, 235 F.2d at 485 (finding a "so-called tax" to be "punitive" where the amount imposed was "exorbitant").

The assessment here is enormous—enough to make digital advertising services unprofitable in Maryland. As we noted earlier (*supra*, at 7) a digital advertising company earning $2 billion in net profit on $15 billion in U.S.-based gross revenue would have around $40 million in pre-tax net income from $300 million in gross revenues earned in Maryland. That would result, under the State's standard 8.25% corporate income tax rate (Tax.-Gen. § 10-105(b)), in a healthy $3.3 million Maryland income tax. But the Act's 10% gross revenue surcharge would impose liability for an *additional $30 million*. That's nearly ten times the corporate income tax, subjecting the company to an effective *83% tax rate* on net income within the State.

In condemning a similar charge imposed by the French Government, the Office of the U.S. Trade Representative noted for just this reason that

"gross revenue" is not "a usual [or] appropriate basis for taxation." *Report on France's Digital Services Tax Prepared in the Investigation under Section 301 of the Trade Act of 1974*, at 55 (Dec. 2, 2019) ("*USTR Report*"), https://perma.cc/XD9H-ZQ44. Among other problems, assessments against gross revenue apply to *all* of a company's income, even if the company is unprofitable or has a low net income, potentially "entirely eliminat[ing] their profit margin." *Id.* at 4; *accord id.* at 55-60.

When a State imposes such "severe and disproportionate monetary consequences" on an entire business model, "the primary purpose of the scheme must be understood as regulatory and punitive rather than revenue raising." *Korte*, 735 F.3d at 670 (holding that a "$100 per day per employee" assessment was "such a high price" as to suggest "the congressional objective is punitive"). The district court did not address this point at all.

***b. Narrow targeting.*** The Act's punitive character is confirmed by the tight targeting of the exaction. "[T]he whole idea of a tax" is not only that it helps to fund the general treasury, but also that it is "a burden generally borne." *GenOn*, 650 F.3d at 1024; *accord Valero*, 205 F.3d at 134 (a tax is assessed "upon a large segment of society") (citing *San Juan Cellular*, 967 F.2d at 685). Thus, "[a]n assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class." *Bidart Brothers*, 73 F.3d at 931. "The fact that [a] charge affects the narrow-

47

est possible class is compelling evidence that it is a punitive fee rather than a tax." *GenOn*, 650 F.3d at 1024.

That is the case here. The Act's tiered structure ensures that only a thin sliver of companies pay the highest, most burdensome levels of the exaction. As we explained below, only about 200 companies anywhere in the world had gross revenues exceeding $15 billion in 2021, including banks, pharmaceutical companies, car manufacturers, oil companies, and defense contractors that do not derive income from internet advertising. The number of companies earning that level of revenue that also happen to derive more than $1 million annually from digital advertising sales in Maryland is exceedingly few. And we know from the legislative history that lawmakers were specifically "taget[ing]" only a handful of particular companies "like Amazon, Facebook, and Google." JA13-14 (¶ 2).

Further, the Act does not impose its assessment against in-state revenues evenhandedly. The tiering of rates based on global revenue means that Company A will pay more than Company B—double, triple, even quadruple—for precisely the same in-state conduct, solely because Company A has greater out-of-state sales. There is no explanation for a progressively more crushing exaction against in-state revenues like this, except an intent to punish large technology companies *for being large*.

48

The Act also exempts from liability all "broadcast" and "news media" entities. Tax-Gen. § 7.5101(d), (g). Such companies are among the biggest sellers of digital advertising services and would have borne much of the Act's brunt. But in lawmakers' eyes, those entities are not among the "[m]assive technology companies" whose perceived bad behavior has "resulted in negative externalities socialized and borne by the public." JA23 (¶ 45). The 2021 amendment's exclusion of "broadcast" and "news media" entities thus underscores that the Act is not principally about raising revenue, but instead about targeting "the narrowest possible class" (*GenOn*, 650 F.3d at 1024) of disfavored companies "like Amazon, Facebook, and Google" (JA13-14 (¶ 2)).

The district court's contrary conclusion (JA155) that "there can be no genuine dispute that many companies . . . will be liable for the charge" ignores critical features of the Act. Because of the Act's tiered structure, only a small handful of specifically identified companies will pay the highest levels of the exaction. And the carve-out for media companies, combined with the legislative history reflecting an intent to target large digital advertising platforms, confirms the targeted nature of the Act.

For its part, the State does not deny that the Act deliberately singles out a narrow range of disfavored firms for the harshest treatment. Nor does it dispute that "an assessment imposed upon a narrow class is less likely to be

49

a tax than an assessment imposed upon a broad class of parties." *GenOn*, 650 F.3d at 1024 (quotation marks omitted). It should go without saying that an exaction paid by three expressly targeted companies, or even 20 or 30, is narrow and not generally borne. *Cf. RILA*, 475 F.3d at 185 (four companies were eligible for the assessment, which was expressly aimed at Wal-Mart).

*c. The pass-through provision.* The 2021 addition of the pass-through provision lends further support to the Act's punitive purpose. If the point of the Act were merely to raise revenue, the legislature would have been indifferent to whether the initial payers pass the charge on to downstream market participants through ordinary economic forces. But it was not. The pass-through provision is express evidence that the legislature wanted to ensure that the initial targets of the surcharge, *and they alone*, bear its burden. The State has continued that theme throughout this litigation, insisting that the point of the provision is to ensure that the tax is borne by large digital advertising companies, and not by others.

To be sure, the pass-through prohibition is ineffectual on this score; as the State has now stipulated, it does not succeed in prohibiting the passing-on of the assessment and instead only muzzles speech (itself suggestive of a disciplinary purpose). But for present purposes, that is beside the point. As the Second Circuit has held, nothing "other than punishment can justify" a

50

legislative attempt (successful or not) to "prevent[ payers] from passing" an exaction along to downstream market participants. *ConEd*, 292 F.3d at 353-355. That was a principal basis for this Court's decision in *GenOn*, and it is equally true here.

**d. *Segregation of the funds and use for remediation.*** Also relevant under the TIA is "whether an injunction would pose a 'threat to the central stream of tax revenue relied on by' the state," which is, after all, the principle concern the TIA was intended to prevent. *American Trucking*, 944 F.3d at 53 (quoting *Trailer Marine*, 977 F.2d at 6).

An injunction here would not pose such a threat. When the proceeds of a levy are "placed in a segregated account and expended by a single entity for a single purpose," they "stand quite apart from the [S]tate's central stream of government funding provided by traditional types of taxes, enough so as to" demonstrate that it is not a "'tax' as used in the TIA." *American Trucking*, 944 F.3d at 53. That is true here.

Moreover, the funds are set aside in a segregated fund specifically to remediate alleged "negative externalities socialized and borne by the public" resulting from the payers' activity. JA23 (¶ 45). That places this case in the same category as *The Head Money Cases*, *Trailer Marine*, and *GenOn*. In *GenOn*, in particular, this Court cited as evidence of a non-tax purpose the decision by lawmakers to earmark 50% of the proceeds of a carbon emissions

51

charge "to funding for County greenhouse gas reduction programs." 650 F.3d at 1025. Here, the proceeds from the charge are likewise earmarked to remediate the perceived harms created by the targeted firms. JA23 (¶ 46); Educ. § 1- 302(a)(1). As the First Circuit has put it, the proceeds are "placed in a segregated account and expended by a single entity for a single [remedial] purpose," thus standing apart from the "central stream of government funding." *American Trucking*, 944 F.3d at 53.

The district court's observation (JA155) that the Blueprint Fund is used to support "the general welfare" and "general government activity that will benefit the entire community" proves too much. As the First Circuit has recognized, a government charge is not a "tax" within the meaning of the TIA solely because it is set aside to fund a "social welfare program" (in that case, a compensation fund for victims of car accidents). *Trailer Marine*, 977 F.2d at 5. Virtually any expenditure of government money can be so characterized, and accepting such a broad interpretation of the word "tax" (money used for the general welfare) would mean that essentially every government levy would constitute a "tax" under the TIA. *Id.*

It also is no answer to say that dollars are fungible, and "more revenue from the general fund would have to be spent" on education if the Act's surcharge were not collected and deposited in the Blueprint Fund. *American Trucking*, 944 F.3d at 52. That, too, "can be said of virtually all activity by a

52

[S]tate and all sources of state revenue: the activity serves the public benefit, and that benefit would need to be paid for (or lost) with general tax revenues but for the alternative revenue source." *Id.* at 53. By those lights, all assessments would be taxes, which, again, "proves too much." *Id.*

*e. The legislative history and circumstances.* "The circumstances surrounding the Act's enactment" and its legislative history, too, point toward a punitive fee that may be challenged in federal court. *See RILA*, 475 F.3d at 189; *accord GenOn*, 650 F.3d at 1025.

Maryland Senate President Ferguson heralded the Romer op-ed as a model for the Act. JA22-23 (¶¶ 43-45). Romer described large digital advertising companies as "too big to trust" and blamed them for creating "a haven for dangerous misinformation and hate speech," expressly encouraging States to impose a "surcharge" or "penalty" on digital advertising. JA22 (¶ 43). In written testimony before the state Senate, Romer continued to rail against these companies as guilty of "pervasive dishonesty," decrying "that something is terribly wrong with the market for digital services." JA22 (¶ 44). The Act was introduced expressly as a "solution" to this perceived misconduct. JA23 (¶ 45). Together with the other facts indicating clear legislative disapproval and a punitive purpose, this strongly suggests that the exaction is a punitive levy that may be challenged in federal court.

The district court did not account for any of this. Its only analysis even indirectly addressing this point was to say that the Act cannot be punitive within the meaning of the TIA's doctrine because it applies to payers who are not engaged in "unlawful conduct." JA156. But it has been evident for more than a century that an exaction may constitute a punitive fee for TIA purposes even when assessed for lawful conduct.

In *Drexel Furniture*, the Supreme Court concluded that a child labor tax—a charge against the income of companies (then) lawfully employing boys under the age of 14—was in fact a penalty for asserted "wrongdoing," and thus not a tax. *Id.* The Court reached that conclusion despite that "Congress d[id] not . . . expressly declare that the employment within the mentioned ages is illegal." 259 U.S. at 38. And *Hill* involved an assessment against lawful sales of grain. 259 U.S. at 257. The Court later held that *Hill* must "be classed with *Lipke*, as [involving] a penalty in the form of a tax." *Graham v. DuPont*, 262 U.S. 234, 258 (1923) (full case citation omitted).

Simply put, the fact that Maryland desired to punish *lawful* conduct makes its purpose no less punitive. *Cf. Austin v. United States*, 509 U. S. 602, 610 (1993) (in an Excessive Fines Clause case, noting that "the question is not . . . whether [a monetary penalty] is civil or criminal, but rather whether it is punishment"). Once again, the district court ignored these arguments.

54

*f. Identity of the government entity assessing the charge.* It is true that the Act was passed by the legislature and not imposed unilaterally by an agency. *See* JA154-155 (district court noting that "a charge is more likely to be a tax if it is imposed by the legislature, which is the case here"). But that alone cannot "disguise what is in substance a punitive and regulatory matter" according to every other relevant consideration. *GenOn*, 650 F.3d at 1024. The charges assessed in *GenOn* and *RILA* also were imposed by the legislature, as were those in *American Trucking*, *Trailer Marine*, *San Juan Cellular*, *Kathrein*, and *Wright*. In each of those cases, reviewing courts did not hesitate to look past that fact and hold that the exaction was not a "tax" within the meaning of the TIA.

The totality of circumstances here thus confirms that the Act's assessment is not a classic tax within the TIA's scope, but rather a punitive fee that is subject to pre-enforcement judicial review in federal court.

## III. THE COURT MUST AT MINIMUM REMAND WITH INSTRUCTIONS TO VACATE THE TIA DECISION AND MODIFY THE FINAL JUDGMENT

This case was not moot when the district court dismissed it, and it is not moot now. But should the Court disagree, its "customary practice . . . is to vacate the moot aspects of the lower court's judgment." *Norfolk Southern Railway Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010). Such is "the duty of the appellate court." *United States v. Munsingwear*, 340 U.S.

36, 40 (1950). If the Court were to affirm on mootness grounds, it thus must remand with instructions to vacate the district court's TIA decision.

If the court reverses on mootness but affirms on the TIA, it must remand with instructions to modify the judgment. A dismissal based on a "defect in subject matter jurisdiction . . . must be one without prejudice." *Southern Walk at Broadlands Homeowner's Association v. OpenBand at Broadlands*, 713 F.3d 175, 185 (4th Cir. 2013). The district court's dismissal of Counts I-III was assertedly on jurisdictional grounds (JA438)[1] but was entered *with* prejudice. A "remand with instructions that [Counts I-III] be dismissed without prejudice" would thus be in order. *Id.*

## CONCLUSION

The Court should reverse the district court's dismissal for mootness and remand with instructions to grant relief on Count IV of the complaint. It also should reverse the dismissal of Counts I-III under the TIA and remand to address the merits of those claims.

---

[1]    It is unclear whether the TIA is in fact a jurisdictional statute or states a mandatory claim-processing rule. *See Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010) (distinguishing "between jurisdictional prescriptions and claim-processing rules"). Although the TIA does not use clear jurisdictional language, courts have sometimes referred to it as jurisdictional. *See Hibbs v. Winn*, 542 U.S. 88, 104 (2004) (discussing legislative history). Yet neither the Supreme Court nor this Court has held that the TIA is jurisdictional in a case where the question was raised. Regardless, a dismissal on TIA grounds should be without prejudice to raising the same claims in state court.

Dated: January 25, 2023

Respectfully submitted,

/s/ *Michael B. Kimberly*

Tara S. Morrissey
Jennifer B. Dickey
Tyler S. Badgley
   *U.S. Chamber Litigation Center*
   *1615 H Street NW*
   *Washington, DC 20062*
   *(202) 463-5337*

*Counsel for the Chamber of Commerce
of the United States of America*

Michael B. Kimberly
Sarah P. Hogarth
Charles Seidell
   *McDermott Will & Emery LLP*
   *500 N. Capitol St. NW*
   *Washington, DC 20001*
   *(202) 756-8000*

*Counsel for all Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), under-signed counsel for intervenors certifies that this brief:

(i)   complies with the type-volume limitation of Rule 32(a)(7) because it contains 12,959 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii)  complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word and is set in Century Supra in 14 points.

Dated: January 25, 2023                    /s/ *Michael B. Kimberly*