No. 22-2275

# United States Court of Appeals
## *for the*
## Fourth Circuit

_____

Chamber of Commerce of the United States of America,
NetChoice, and Computer & Communications Industry Association,

*Plaintiffs-Appellants*,

– v. –

Brooke E. Lierman,

*Defendant-Appellee.*

_____

On appeal from the
United States District Court for the District of Maryland
Case No. 21-cv-410-LKG

_____

**REPLY BRIEF**

_____

<div style="display:flex">

Tara S. Morrissey
Jennifer B. Dickey
   *U.S. Chamber Litigation Center*
   *1615 H Street NW*
   *Washington, DC 20062*
   *(202) 463-5337*

*Counsel for the Chamber of Commerce*
*of the United States of America*

Michael B. Kimberly
Sarah P. Hogarth
Charles Seidell
   *McDermott Will & Emery LLP*
   *500 N. Capitol Street NW*
   *Washington, DC 20001*
   *(202) 756-8000*

*Counsel for all Appellants*

</div>

## TABLE OF CONTENTS

Table of Authorities ................................................................... ii

Introduction ........................................................................... 1

Argument ............................................................................... 2

I.  The pass-through provision should be invalidated .................... 2

    A.  The district court had jurisdiction to resolve the merits of
        appellants' challenge to the pass-through provision ..................... 2

        1.  The challenge to the pass-through provision is not barred
            by the TIA or tax comity ................................................. 2

        2.  The challenge to the pass-through provision is not moot,
            nor would abstention be appropriate ................................ 5

    B.  The pass-through provision violates the First Amendment ............ 10

        1.  The Court should decide the merits of Count IV ................. 10

        2.  The provision regulates speech, not conduct .................... 12

        3.  The pass-through provision flunks any level of scrutiny .......... 14

II. The Tax Injunction Act does not bar appellants' challenges to the
    levy itself .......................................................................... 16

    A.  This Court's TIA cases, including *Valero* and *GenOn*,
        remain good law and require reversal ............................... 18

        1.  *CIC Services* did not wipe away a century of case law .............. 19

        2.  A state-law exaction may be a punitive fee outside the
            TIA's scope even if it is assessed on lawful conduct ................ 21

        3.  No other case has overruled the multifactor TIA
            framework ............................................................... 24

    B.  Measured against the correct standards, the Act imposes a
        punitive fee, review of which is not barred by the TIA .................. 25

Conclusion ........................................................................... 28

## TABLE OF AUTHORITIES

**Cases**

*American Trucking Associations v. Alviti,*
944 F.3d 45 (1st Cir. 2019) ........................................................ 27

*Ankenbrandt v. Richards,*
504 U.S. 689 (1992) ................................................................... 23

*Ashcroft v. ACLU,*
535 U.S. 564 (2002) ............................................................. 10, 11

*Bailey v. George,*
259 U.S. 16 (1922)........................................................ 20, 21, 22

*BellSouth Telecommunications v. Farris,*
542 F.3d 499 (6th Cir. 2008)................................... 3, 12, 14, 15

*Bidart Bros. v. California Apple Commission,*
73 F.3d 925 (9th Cir. 1996) .............................................. 23, 27

*Bloom v. O'Brien,*
841 F. Supp. 277 (D. Minn. 1993) ..................................... 13, 14

*Brillhart v. Excess Insurance Company of America,*
316 U.S. 491 (1942) ..................................................................... 7

*Chase Brexton Health Services v. Maryland,*
411 F.3d 457 (4th Cir. 2005)....................................................... 9

*CIC Services v. IRS,*
141 S. Ct. 1582 (2021) ........................................... 3, 17, 18, 19

*Citizens United v. FCC,*
558 U.S. 310 (2010)....................................................................15

*Colorado River Water Conservation District v. United States,*
424 U.S. 800 (1976) ......................................................... 7, 8, 9

*ConEd v. Pataki,*
292 F.3d 338 (2d Cir. 2002) ..................................................... 26

*Department of Labor v. Greenwich Collieries,*
512 U.S. 267 (1994)................................................................... 23

*Direct Marketing Association v. Brohl,*
575 U.S. 1 (2015) ...................................................................... 20

**Cases—continued**

*DIRECTV, Inc. v. Tolson,*
  513 F.3d 119 (4th Cir. 2008) ........................................................ 5

*Education Media Company at Virginia Tech v. Swecker,*
  602 F.3d 583 (4th Cir. 2010) ...................................................... 11

*Folio v. City of Clarksburg, West Virginia,*
  134 F.3d 1211 (4th Cir. 1998) .................................................... 20

*GenOn Mid-Atlantic, LLC v. Montgomery County, Maryland,*
  650 F.3d 1021 (4th Cir. 2011) ............................................*passim*

*Gonzales v. Sessions,*
  894 F.3d 131 (4th Cir. 2018) ...................................................... 24

*Graham v. Dupont,*
  262 U.S. 234 (1923) ............................................................ 22, 23

*Head Money Cases,*
  112 U.S. 580 (1884) .................................................................. 23

*Hill v. Wallace,*
  259 U.S. 44 (1922) .............................................................. 22, 23

*Judicial Watch v. Rossotti,*
  317 F.3d 401 (4th Cir. 2003) ........................................................ 4

*Korte v. Sebelius,*
  735 F.3d 654 (7th Cir. 2013) ...................................................... 26

*Levin v. Commerce Energy,*
  560 U.S. 413 (2010) ................................................................ 4, 5

*Liberty University v. Lew,*
  733 F.3d 72 (4th Cir. 2013) ............................................ 22, 24, 25

*Lipke v. Lederer,*
  259 U.S. 557 (1922) .................................................................. 22

*Mobil Oil Corp. v. Tully,*
  639 F.2d 912 (2d Cir. 1981) ........................................................ 3

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,*
  460 U.S. 1 (1983) ...................................................................... 8

*National Private Truck Council, Inc. v. Oklahoma Tax Commission,*
  515 U.S. 582 (1995) .................................................................. 6

**Cases—continued**

*Nelson v. Appleway Chevrolet,*
    157 P.3d 847 (Wash. 2007)....................................................................13

*New Beckley Miningv. United Mine Workers of America,*
    946 F.2d 1072, 1073 (4th Cir. 1991) ..................................... 8

*New Wellington Financial Corp. v. Flagship Resort Development Corp.,*
    416 F.3d 290 (4th Cir. 2005) .................................................. 7

*NFIB v. Sebelius,*
    567 U.S. 519 (2012)....................................................... 20, 25

*Norfolk Southern Railway v. City of Roanoke,*
    916 F.3d 315 (4th Cir. 2019) ....................................... 18, 24, 25

*Perry v. Bartlett,*
    231 F.3d 155 (4th Cir. 2000)........................................... 10

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ................................................... 10

*Regal Drug Corp. v. Wardell,*
    260 U.S. 386 (1922) ....................................................... 22

*RILA v. Fielder,*
    475 F.3d 180 (4th Cir. 2007) ...................................... 24, 26

*S-1 v. Spangler,*
    832 F.2d 294 (4th Cir. 1987) ............................................ 6

*San Juan Cellular Telephone v. Public Service Commission of Puerto Rico,*
    967 F.2d 683 (1st Cir. 1992)......................................... 23

*Satellite Broadcast and Communications Association v. FCC,*
    275 F.3d 337 (4th Cir. 2001).........................................11

*Shalala v. Illinois Council on Long Term Care, Inc.,*
    529 U.S. 1 (2000) ......................................................... 19

*Valero Terrestrial Corp. v. Caffrey,*
    205 F.3d 130 (4th Cir. 2000) ....................................*passim*

*vonRosenberg v. Lawrence,*
    849 F.3d 163 (4th Cir. 2017)....................................... 8, 9

*White Coat Waste Project v. Greater Richmond Transit Co.,*
    35 F.4th 179 (4th Cir. 2022) .........................................11

**Statutes and legislative materials**

8 U.S.C. § 1101(a)(48)(A) ............................................................ 24

26 U.S.C. § 7421(a) ...................................................................... 3

28 U.S.C. § 1341 .......................................................................... 4

47 U.S.C. § 151, note ..................................................................21

Md. Tax. Gen. § 7.5-102(c) .............................................. 1, 12, 13

H.R. Rep. No. 1503, 75th Cong., 1st Sess. (1937) ......................... 27

S. Rep. No. 1035, 75th Cong., 1st Sess. (1937) ............................. 27

**Other Authorities**

13B Fed. Prac. & Proc. Juris. § 3533.2.1 (3d ed. 2022) .................... 5

**INTRODUCTION**

Maryland lawmakers wish to avoid political responsibility for the increased cost of digital advertising services in the State resulting from the Maryland Digital Advertising Gross Revenues Tax Act. They also wish to make it harder for appellants' members to recover the costs of the Act from their customers. To those ends, they passed Tax-Gen. § 7.5-102(c), which does just one thing: It forbids payers of the Act's exaction from identifying price increases attributable to the Act with a "separate fee, surcharge, or line-item" on bills. That is a clear-cut, content-based speech ban, which the State has failed to justify under any level of scrutiny. Other courts have not hesitated to invalidate such laws, and this Court should not either.

Not even Maryland defends the district court's dismissal of appellants' First Amendment claim on mootness grounds. That is no surprise, because there undoubtedly is a live controversy between the parties on this issue. Maryland argues, instead, that the Court should affirm on alternative grounds, including comity and abstention. But those doctrines are inapplicable here. The State also suggests that the district court had nearly unchecked discretion to decline jurisdiction for vaguely defined "prudential" reasons, no matter that Count IV implicates grave constitutional interests. But that is simply wrong. The district court should have resolved the merits of Count IV. And in doing so, it should have granted relief.

1

The district court also was wrong to dismiss Counts I-III under the Tax Injunction Act. Longstanding precedent confirms that the TIA does not bar federal-court review of punitive fees, which describes the levy here: It is an exorbitantly large, restitutionary impost targeted at the gross income of just a few companies; it includes an expressly punitive pass-through provision; its proceeds are kept separate from the general treasury and used for remediation of supposed externalities; and the statutory and legislative history reveals an express intent to punish. This is not the kind of classic "tax" excepted from pre-enforcement judicial review by the TIA.

For its part, Maryland does not even attempt to refute our demonstration on most of these points. It instead cites two recent cases that it says silently jettisoned nearly a century of TIA case law. Because that is not a credible position, the Court should reverse.

## ARGUMENT

## I.   THE PASS-THROUGH PROVISION SHOULD BE INVALIDATED

### A.   The district court had jurisdiction to resolve the merits of appellants' challenge to the pass-through provision

#### 1.   *The challenge to the pass-through provision is not barred by the TIA or tax comity*

The State asserts (at 31-33) that federal-court review of appellants' challenge to the pass-through provision is barred by the TIA. But the district court did not dismiss Count IV on that ground, and for good reason: Appel-

lants' challenge to the pass-through provision does not request an injunction restraining the collection of a state levy of any kind. All that appellants seek on Count IV is an injunction that would "allow [their members] to identify the [Act's assessment] on [customers'] bill[s]" with a separately stated line-item, allowing them "to explain to their customers why they have raised prices." *BellSouth Telecommunications v. Farris*, 542 F.3d 499, 502 (6th Cir. 2008). Such an injunction is not within the TIA's scope under any theory.

"The mere fact that the anti-pass-through section is contained in a tax law" does not change the analysis. *Id.* at 503 (quotation marks omitted); *accord Mobil Oil Corp. v. Tully*, 639 F.2d 912, 918 (2d Cir. 1981). Arguing otherwise, the State relies on a single, out-of-context sentence from *CIC Services*: "If the *suit* is for [the] purpose [of restraining the collection of a tax], it must be dismissed." 141 S. Ct. at 1588 (emphasis added). Thus, in Maryland's view (Br. 31), if a "suit" contains a claim covered by the AIA (or, by implied extension, the TIA), the purpose of the "suit" is to restrain a tax, and the entire "suit" must be dismissed.

There are two problems with that position. First, *CIC Services* was merely describing the AIA's text, which specifies that "no suit" falling within its scope "shall be maintained." 26 U.S.C. § 7421(a). But the TIA, which was not at issue in *CIC Services*, uses different language: "The district

courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law." 28 U.S.C. § 1341. Count IV of the complaint does not seek such an injunction, so it is not barred by the TIA's plain text.

Second, Maryland's contrary position would be pointless as a practical matter. By the State's own reasoning, appellants could refile Count IV as a standalone challenge the day following dismissal under the TIA, as long as they dropped Counts I-III. That would waste party and judicial resources while accomplishing nothing of meaning. That is why this Court has declined to apply even the AIA as the State suggests. *See Judicial Watch v. Rossotti*, 317 F.3d 401 (4th Cir. 2003) (dismissing only some claims under the AIA, but allowing others to proceed).

Principles of "tax comity" do not suggest a different outcome. *See* State Br. 33-36. As a starting point, the State does not cite any prior case in which a federal court has relied on tax comity to dismiss a claim concerning speech about a state tax. The Supreme Court's decision in *Levin v. Commerce Energy*, 560 U.S. 413 (2010), is not such a case. There, the Court held that a federal-court injunction that would entail an increase (rather than decrease) in state taxes by "reshap[ing] the relevant provisions of [a state] tax code" would not strictly be prohibited by the TIA but would constitute an "interference in state taxation the comity doctrine aims to avoid." *Id*. at 429.

4

There is nothing like that here, again for two reasons. First, because the pass-through provision regulates only speech, an injunction against its enforcement would not constitute an "interference in state taxation" (*Levin*, 560 U.S. at 429) regardless of the status of the exaction under the TIA. The Act's charge could be assessed and collected equally well, with or without the pass-through provision. Second, for all the reasons we have explained above, the levy at issue is not a "tax" for TIA purposes in any event, and so it is not a "tax" for comity purposes, either. *See DIRECTV, Inc. v. Tolson*, 513 F.3d 119, 125 (4th Cir. 2008).

### 2. *The challenge to the pass-through provision is not moot, nor would abstention be appropriate*

**a.** Maryland does not defend the district court's conclusion that appellants' challenge to the pass-through provision is moot in the non-waivable, constitutional sense. Nor could it. It is rote that a judgment in one lawsuit "that grants part but not all of the relief sought" in another lawsuit "does not moot the demand for additional relief" in the other lawsuit. *See* 13B Fed. Prac. & Proc. Juris. § 3533.2.1 (3d ed. 2022) ("Wright & Miller"); *see* Opening Br. 15-19. That is especially so where (as here) the judgment is pending appellate review by the state supreme court. *Id.*

Maryland argues (at 36-40) that nebulous "prudential concerns" support the district court's "dismissal, without prejudice, of plaintiffs' remain-

ing challenge to the Act's direct pass-through prohibition" given the Maryland circuit court's declaration that the Act's assessment (but not the pass-through provision itself) is unlawful. None of the State's arguments in support of that position has any merit.

First, Maryland says that "courts [generally] should adopt a hands-off approach with respect to state tax administration." Br. 38 (quoting *National Private Truck Council, Inc. v. Oklahoma Tax Commission*, 515 U.S. 582, 590 (1995)). But that is just tax comity stated another way. Again, the challenge to the pass-through provision would not affect the State's ability to collect the exaction.

Next, the State suggests that relief on Count IV would not have "sufficient utility" to warrant declaratory or injunctive relief. Br. 37 (quoting *S-1 v. Spangler*, 832 F.2d 294, 297 (4th Cir. 1987)). But Maryland notes in its state-court brief that more than $100 million in estimated payments have been made under the Act, notwithstanding the circuit court's judgment. And it steadfastly refuses to voluntarily cease enforcement of the pass-through provision. Thus, as matters now stand, those who have remitted estimated payments under the Act ($100 million and counting) may recover the exaction from customers, but they may not explain their price increases with express line-items or surcharges on account statements and bills. Against this backdrop, it would beggar belief to say that an injunction would have no

practical utility. The State offers no explanation of why or how the requested relief would lack utility in light of these facts, which were fully laid out in the opening brief (at 21-23).

Finally, Maryland suggests that federal courts have unbounded "discretion to withhold declaratory relief" and asserts that such discretion "'is especially crucial when, as here, a parallel or related proceeding is pending in state court.'" Br. 39 (quoting *New Wellington Financial Corp. v. Flagship Resort Development Corp.*, 416 F.3d 290, 297 (4th Cir. 2005)). But *New Wellington Financial* was a diversity case concerning matters of *state* law. The Court held that federal-court diversity proceedings may yield "where another suit is pending in a state court presenting the same issues, *not governed by federal law*, between the same parties." 416 F.3d at 297 (emphasis added) (quoting *Brillhart v. Excess Insurance Company of America*, 316 U.S. 491, 495 (1942) (diversity case)). That sheds no light on *this* case, which arises under federal question jurisdiction and implicates strong federal interests in vindicating core First Amendment rights.

**b.** By citing *New Wellington* and *Brillhart*, Maryland is, in actuality, attempting to justify the dismissal below on abstention grounds, not prudential mootness. But abstention was long ago waived, and there is little wonder why: The only abstention doctrine that might even remotely apply here is *Colorado River Water Conservation District v. United States*, 424 U.S.

800 (1976). That doctrine permits deviation from a federal court's "virtually unflagging obligation" to exercise jurisdiction only in the most "exceptional circumstances" (424 U.S. at 813, 817-818), requiring "the clearest of justifications" before a federal court's "surrender of that jurisdiction" (*vonRosenberg v. Lawrence*, 849 F.3d 163, 167 (4th Cir. 2017)). Here, such justifications are entirely absent.

For starters, a federal court must "conclude[] that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of [all of] the issues between the parties." *vonRosenberg*, 849 F.3d at 168. Accordingly, "[i]f there is any serious doubt that the state action would resolve all of the claims [in the federal action], 'it would be a serious abuse of discretion' to abstain." *Id.* at 167 (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 28 (1983)). Here, there is not just doubt but certainty on this point—the state-court action did not resolve appellants' challenge to the pass-through provision.

In addition, the two federal and state cases must involve "substantially the same parties." *Id.* at 168 (quoting *New Beckley Miningv. United Mine Workers of America*, 946 F.2d 1072, 1073 (4th Cir. 1991)). This requirement is "strictly" enforced (*id.*), and it also is not satisfied here—the parties are facially different.

Finally, "even if the federal and state suits are duplicative" in the sense just described, "*Colorado River* requires a court to balance carefully [several] other factors before abstaining." *Id.* (quoting *Chase Brexton Health Services v. Maryland*, 411 F.3d 457, 463-464 (4th Cir. 2005)). The court "look[s] at these factors holistically, 'with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Id.* Here, those factors point almost uniformly against a stay or dismissal: this is not an *in rem* action, the federal forum is not inconvenient, federal law provides the rule of decision, the state-court appeal cannot adequately protect appellants' rights, and the federal action was filed first. *Id.*

The bottom line is simple: The challenge to the pass-through provision is not moot in the constitutional sense because the state-court judgment did not resolve that claim and, in all events, an appeal is pending. Nor do vague prudential reasons, whether grounded in comity or abstention, allow the district court to duck its "virtually unflagging obligation" to exercise jurisdiction. *Colorado River*, 424 U.S. at 813. In light of the serious federal constitutional issues at stake here, the district court should have resolved the merits of Count IV; its failure to do so was error and thus "a serious abuse of discretion." *vonRosenberg*, 849 F.3d at 168 (quotation marks omitted).

### B.    The pass-through provision violates the First Amendment

#### 1.    *The Court should decide the merits of Count IV*

This Court's resolution of the First Amendment challenge to the pass-through provision is warranted because "the question is purely a legal one" concerning an important issue of constitutional law and no deference would be owed to a decision to the district court, rendering a remand "unnecessary." *Perry v. Bartlett*, 231 F.3d 155, 160 (4th Cir. 2000). After two years of litigation before the district court—with fourteen merits briefs and three oral arguments, but no merits decision to show for it—this Court's resolution of the matter without a remand is sorely needed.

Maryland urges the Court to remand without reaching the merits, asserting (Br. 41-42) that appellants' "facial challenge to the Act" turns on "their members' circumstances" and cannot be resolved without "sufficiently 'precise facts'" needed to understand how the Act's speech ban is being applied. The State misunderstands how facial challenges work.

Content-based speech restrictions like the pass-through provision are "presumptively unconstitutional" in all their applications. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). That is because the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). Accordingly, a plaintiff makes a prima facie showing that a law is facially

invalid (*i.e.*, that it lacks any legitimate applications) by demonstrating that the law is a content-based regulation of speech (*id.*), as is the law here. The State can overcome this presumption only by showing that the prohibition satisfies the applicable level of scrutiny (*id.*)—but as we have explained time and again, Maryland has not done so.

A facial challenge to a content-based speech restriction turns exclusively on "the plain terms of the regulation" and "whether, on its face, the regulation confers benefits or imposes burdens based upon the content of the speech it regulates." *Satellite Broadcast and Communications Association v. FCC*, 275 F.3d 337, 353–54 (4th Cir. 2001) (quotation marks omitted). A facial First Amendment challenge therefore "can be decided 'without regard to its impact on the plaintiff.'" *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 204 (4th Cir. 2022). That is to say, a conclusion that the pass-through provision on its face violates the First Amendment does not "depend[] on the identity or circumstances of the plaintiffs." *Id.* at 204-205; *accord Education Media Company at Virginia Tech v. Swecker*, 602 F.3d 583, 588 (4th Cir. 2010) ("[A] court considers the facial constitutionality of a regulation without regard to its impact on the plaintiff asserting the facial challenge.").

## 2.    *The provision regulates speech, not conduct*

Maryland's principal defense of the pass-through provision is to say (Br. 42-47) that it regulates conduct and not speech. That is wrong.

The State has stipulated (JA178) that the pass-through provision does not prohibit payers from "passing on the cost" of the exaction to customers "by factoring such cost into customer pricing." Accordingly, there is no dispute that the pass-through provision permits payers of the exaction to add the entire amount of the exaction to their invoices, recovering 100% of it from their customers. The *only* thing it forbids is the express identification of the amount as a "separate fee, surcharge, or line-item." Tax-Gen. § 7.5-102(c). That is nowise a regulation of conduct.

*BellSouth* proves the point. There, the Sixth Circuit considered not only a speech ban like the pass-through provision here, but also a "no-direct-collection clause," which "banned providers from 'collect[ing] the tax directly' from consumers." 542 F.3d at 500. The court held that this additional provision regulated conduct rather than speech because "one could directly collect the tax without separately stating it" and "separately state the tax without collecting it directly." *Id.* at 511. Thus the bar on "collection of the tax" operated independently of the bar on express line-items. But the court went on to hold that the provision regulating only speech (line-items on bills) violated the First Amendment. *Id.* at 505.

12

Here, only a speech regulation is at issue. The State has stipulated that "[t]he cost of the tax is passed on directly"—and therefore prohibited under Tax-Gen. § 7.5-102(c)—"*only* when it is imposed on the customer by means of a 'separate fee, surcharge, or line-item.'" JA178 (emphasis added). Thus, the sole difference between a permissible "indirect" pass-along and an impermissible "direct" pass-along is whether the price increase is expressly stated with a separate fee, surcharge, or line-item. That is a regulation of speech, plain and simple.

*Nelson v. Appleway Chevrolet*, 157 P.3d 847 (Wash. 2007), does not counsel differently. There, the defendant purported to shift the legal obligation to pay a particular tax to customers by contract, independent of and above the agreed sale price. *Id.* at 850. In rejecting the defendant's First Amendment challenge to the law, the court explained that the defendant (unlike appellants here) was "free to disclose and itemize any tax or cost" on its invoices and to "inform" customers that a specific amount of the final price "would be used to pay" the tax. *Id.* at 852. That is not this case. Instead, this case resembles *Bloom v. O'Brien*, 841 F. Supp. 277 (D. Minn. 1993), which the Washington court distinguished. In *Bloom*, the district court granted injunctive relief on First Amendment grounds where "health care providers [were permitted] to pass [a] tax along to consumers," but state

13

law barred them "from itemizing the cost of the gross revenue tax on invoices." *Id.* at 278. That is this case to a tee.

### 3.    *The pass-through provision flunks any level of scrutiny*

As an initial matter, the State's arguments that the pass-through provision is exempt from scrutiny under the First Amendment must fail. First, Maryland asserts (Br. 50-51) that, if the pass-through provision regulates speech, it regulates only "government speech" and is thus free from First Amendment scrutiny altogether. But speech *about* the government is not somehow converted to speech *by* the government simply because the content of the speech is "dictated" (Br. 50) by the government and its unlawful conduct or laws; if that were so, then any speech restriction could be recast and upheld as government speech. The prohibited speech here is private speech.

Nor is the pass-through provision excepted from constitutional scrutiny because it bars "speech 'integral to' unlawful activity." State Br. 52. Maryland has admitted (JA178) that it is *lawful* to raise prices to recover the Act's levy. Speech that merely describes "the reasons for these price increases does not advance an illegal transaction" or in any sense "concern unlawful activity." *BellSouth*, 542 F.3d at 506. By insisting otherwise, Maryland in effect argues that the pass-through provision "concern[s] an unlawful activity because the line items [themselves] would violate the

14

speech ban." *Id.* But that is circular logic; speech does not concern unlawful conduct in the *Central Hudson* sense simply because the speech itself is made illegal by the challenged statute. Otherwise, in Maryland's flawed view, all commercial speech bans would be constitutional.

Beyond that, the State devotes just six sentences (Br. 54-55) to a defense of the pass-through provision under the *Central Hudson* test, even though it bears the burden under that standard.

The State asserts (Br. 54) that the "substantial interest" served by the provision is to ensure that the "cost will be borne, to the extent possible, by prosperous companies, not their customers." A bare desire to ensure that a penalty is borne by the targeted speaker cannot be a legitimate government interest, let alone a substantial one. *See Citizens United v. FCC*, 558 U.S. 310, 341 (2010) (speech restrictions cannot be justified on the ground that the speaker is "disfavored"). And assuming arguendo that it *were* a legitimate governmental interest, the provision here (which censors line-items on invoices) is utterly ineffectual for achieving it, because it does not "prohibit a person who derives gross revenues from digital advertising services in the State from indirectly passing on the cost of the tax." JA178. It is not even clear given the State's concessions whether the Act would survive *rational basis* review. This kind of flimsy reasoning does not come close to satisfying *Central Hudson.*

And of course, Maryland's failure to satisfy the lesser strictures of intermediate scrutiny is a failure to satisfy strict scrutiny—the standard that actually applies to content-based speech regulations. *See* Opening Br. 32. Although the Court need not reach the issue, it bears noting that Maryland does not even attempt to address strict scrutiny. That omission is fatal.

## II.    THE TAX INJUNCTION ACT DOES NOT BAR APPELLANTS' CHALLENGES TO THE LEVY ITSELF

The Court should reverse the dismissal of Counts I-III as well. When Congress enacted the TIA in 1937, there was no doubt that an impost with a principally punitive purpose, earmarked for restitutionary programs, and segregated from the general treasury, was not a "tax" in the classic sense. *See* Opening Br. 38-41. Contemporary cases—including *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130 (4th Cir. 2000), and *GenOn Mid-Atlantic, LLC v. Montgomery County, Maryland*, 650 F.3d 1021 (4th Cir. 2011)—have carried that rule forward, establishing a multifactor framework for its application. Here, the overwhelming majority of factors within that framework indicate that the Act's exaction is a penalty, not a "tax," within the special meaning of the TIA. In particular:

- it is tremendously burdensome, so much so that it is capable of entirely wiping out a payer's profits on all in-State commercial activity;

- it is deliberately targeted at an extremely narrow population of payers—especially at the highest rate of assessment, which applies

to just a few companies that were expressly singled-out by name in the lawmaking process;

- it includes a pass-through prohibition, ostensibly (if ineffectually) to ensure that the targeted companies bear the burden of the charge;

- its proceeds are placed in a segregated fund earmarked to offset the alleged "externalities" of the payers' conduct, akin to a restitution payment; and

- the legislative history reveals an express intent to impose a penalty against large multinational companies, punishing them for allegedly harming the free flow of reliable information over the internet.

For its part, the State has never once denied that the purpose, form, and function of the Act is to punish targeted companies for purportedly causing social harms and to collect restitutionary payments from them to fund remediation efforts. Its principal response is to say, instead, that *CIC Services v. IRS*, 141 S. Ct. 1582 (2021)—a case having nothing to do with the tax/fee distinction under the TIA—wiped away a century's worth of case law and established a new rule according to which *all* state levies are "taxes" within the meaning of the TIA, unless Congress passes a special statute stating otherwise or the exaction is a fine assessed for illegal conduct.

That is not a credible position. The Supreme Court and courts of appeals have developed a comprehensive framework for evaluating the nature of government assessments for TIA purposes. Under that framework, the assessment here is not a "tax" under the TIA and therefore may be reviewed in federal court.

### A. This Court's TIA cases, including *Valero* and *GenOn*, remain good law and require reversal

As we explained in the opening brief (at 42-43), this Court has long acknowledged that, to determine whether the TIA applies, it "must examine the explicit factual circumstances that transcend the literal meaning of the terminology and ask whether the charge is levied primarily for revenue raising purposes, making it a tax, or whether it is assessed primarily for regulatory or punitive purposes, making it a fee." *GenOn*, 650 F.3d at 1023 (quotation marks omitted) (quoting *Valero*, 205 F.3d at 134). This approach turns on "a totality-of-the-facts-and-circumstances test" that resists "rigid rules" or "mechanical conclusion[s].'" *Norfolk Southern Railway v. City of Roanoke*, 916 F.3d 315, 326-327 (4th Cir. 2019) (Wynn, J., concurring).

Maryland implies (without saying so expressly) that these cases were abrogated by *CIC Services*. In the State's view (Br. 15-18), *CIC Services* held that the TIA bars federal-court review of *any and every* state-law exaction, no matter its character, excepting just two "scenarios" that take a case outside the TIA's scope. In the first scenario, according to the State (Br. 16), Congress must enact a law providing expressly that the state-law charge being challenged does not constitute a "tax" under the TIA. In the second scenario (Br. 17), the challenged levy must be assessed as "punishment for an unlawful act or omission."

18

Of course, Maryland is correct that the TIA would not apply in those circumstances; but it is wrong that the TIA bars pre-enforcement review in federal court of all other state-law assessments. Nor are any of its other arguments sufficient to avoid this Court's longstanding multifactor test.

### 1.    CIC Services *did not wipe away a century of case law*

As a threshold matter, *CIC Services* did not implicate the distinction between a punitive fee and a classic tax within the meaning of the AIA, let alone the TIA. The issue in *CIC Services* was "whether the Anti-Injunction Act bars CIC's suit complaining that [certain IRS] reporting requirements violate the [Administrative Procedure Act]." 141 S. Ct. at 1588. Answering that question in the negative, the Court reasoned that "[a] reporting requirement is not a tax[,] and a suit brought to set aside such a rule is not one to enjoin a tax's assessment or collection." *Id.* at 1588-1589. It is implausible to say that, in answering that narrow question, the Supreme Court intended to jettison a century of precedent concerning a distinction that was not implicated, under a statute that was not at issue in the case. The Supreme Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). It did not do so here.

It makes a difference, too, that *CIC Services* concerned the AIA and not the TIA. To be sure, judicial interpretation of one is highly relevant to the

19

other (*Direct Marketing Association v. Brohl*, 575 U.S. 1, 8 (2015)), but there are important practical differences between the two statutes. In an AIA case, "the best evidence of Congress's intent" to bar a pre-enforcement challenge to a federal exaction is its use of the "tax" label. *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012). If Congress denominates an assessment a "tax," it indicates an express intent to bar review under the AIA; whereas if it denominates it a "fee" or "penalty," it indicates an intent to permit pre-enforcement judicial review. *Id.* The Supreme Court has "thus applied the Anti-Injunction Act to statutorily described 'taxes' even where that label was [substantively] inaccurate." *Id.* (citing *Bailey v. George*, 259 U.S. 16 (1922)). This explains Maryland's supposed first "scenario," where Congress expressly indicates whether it intends the AIA to apply.

But that reasoning is out of place in TIA cases, which concern challenges to state laws enacted by state legislatures, not federal laws enacted by Congress. In such cases, the question whether the TIA applies is "guided by federal [TIA] law rather than state tax labels." *Folio v. City of Clarksburg, West Virginia*, 134 F.3d 1211, 1217 (4th Cir. 1998). In other words, courts cannot "focus on the superficial 'nomenclature provided to the charge'" by the state legislature (*GenOn*, 650 F.3d at 1023), which renders the label used irrelevant. And because it is not otherwise realistic to expect Congress

20

to enact standalone TIA carveouts on a case-by-case basis, the State's "first scenario" is essentially a null set.[1]

### 2.    *A state-law exaction may be a punitive fee outside the TIA's scope even if it is assessed on lawful conduct*

Maryland's second scenario—an exaction "deemed a penalty or punitive" because it is assessed for "unlawful" conduct (Br. 18)—is far too narrow. No doubt, when an assessment is imposed against unlawful conduct, it is strong evidence of punitive intent. But it is in no way necessary for an assessment to constitute a punitive fee under the TIA.

As the opening brief explained (at 54), *Drexel Furniture* held that "there comes a time in the extension of the penalizing features of [a] so-called tax when it loses its character as such and becomes a mere penalty." 259 U.S. at 38. On that basis, the Court concluded that a child labor tax—a charge assessed against the net income of only those companies employing children under the age of 14—was not a tax at all, but a penalty for asserted "wrongdoing." *Id.* That was so, the Court held, despite that Congress had

---

[1]    The State asserts (Br. 16-17) that any state-law assessment covered by the Internet Tax Freedom Act (ITFA) necessarily falls with the TIA's scope because ITFA uses the word "tax." But unlike the TIA, ITFA supplies an express definition of a covered "tax," which explicitly encompasses "*any* charge" that is not a use fee. *See* 47 U.S.C. § 151, note § 1105(8)(A) (emphasis added). That is a distinct meaning from the interpretation given the TIA by the judicial precedents discussed in the opening brief.

*not* by then "expressly declare[d] that the employment within the mentioned ages is illegal." *Id.*[2]

Similarly, the Court held in *Graham v. Dupont*, 262 U.S. 234 (1923), that the impost levied on certain lawful sales of grain at issue the previous Term in *Hill v. Wallace*, 259 U.S. 44 (1922), was properly "classed" as a "penalty" despite having been labeled a "tax" on legal conduct. 262 U.S. at 258. And in *GenOn*, this Court held that a pre-enforcement federal-court challenge to a county-imposed "exaction on carbon dioxide emissions" was permissible because the exaction was "in substance a punitive" charge, albeit one assessed because of lawful conduct. 650 F.3d at 1024. These cases foreclose the State's argument.

*Lipke v. Lederer*, 259 U.S. 557 (1922), and *Regal Drug Corp. v. Wardell*, 260 U.S. 386 (1922), are not to the contrary. *See* State Br. 24. Those cases confirm only that a "punishment for infraction of the law" has the "definite function of a penalty." *Lipke*, 259 U.S. at 561-562. But neither suggests that a punishment for lawful conduct deemed blameworthy by the legislature cannot also function as a penalty. Again, *Drexel Furniture*, *Graham*, *Hill*, and *GenOn* show that it can be.

---

[2]   The Court's analysis in *Liberty University v. Lew*, 733 F.3d 72, 98 (4th Cir. 2013), appears to have misapprehended this point, characterizing *Drexel Furniture* as concerning unlawful conduct. Respectfully, we refer the Court to the facts of *Drexel Furniture*, which speak for themselves.

It is of no moment that *Drexel Furniture*, *Graham*, and *Hill* are Tax Clause cases. *See* State Br. 18-20. Maryland is correct that the Tax Clause is not a limit on state power, but that is not the point. The point, instead, is that the TIA must be interpreted against the historical background of its adoption. After all, statutory language is to be given "the meaning generally accepted in the legal community at the time of [the statute's] enactment." *Department of Labor v. Greenwich Collieries*, 512 U.S. 267, 275 (1994). Here, the Supreme Court's decisions in *Drexel Furniture*, *Graham*, *Hill*, and the *Head Money Cases*, 112 U.S. 580 (1884), were all decided in years preceding the TIA's adoption in 1937. And there is no evidence that the 75th Congress intended to reject the Court's construction of the word "tax" in those cases when it enacted the TIA.

The Court therefore must "presume" that when Congress acted in 1937, it "did so with full cognizance of the [Supreme Court's] interpretation" of the word "tax" in its Tax Clause cases and, absent contrary indications, intended to incorporate that interpretation into the TIA undisturbed. *Ankenbrandt v. Richards*, 504 U.S. 689, 700 (1992). That is why pre-1937 Tax Clause cases are highly pertinent in TIA cases—and why modern courts routinely cite them for that purpose. *E.g.*, *Bidart Bros. v. California Apple Commission*, 73 F.3d 925, 932-933 (9th Cir. 1996); *San Juan Cellular Telephone Co. v. Public Service Commission of Puerto Rico*, 967 F.2d 683, 686-

23

687 (1st Cir. 1992) (Breyer, J.). Maryland concedes their relevance by relying at length (Br. 20-22, 25-27) on the Tax Clause analysis from *Liberty University v. Lew*, 733 F.3d 72 (4th Cir. 2013).

### 3. *No other case has overruled the multifactor TIA framework*

None of Maryland's other cases supports its effort to avoid the multi-factor TIA framework. For example, *Gonzales v. Sessions*, 894 F.3d 131 (4th Cir. 2018), did not involve the meaning of the term "tax" at all, much less its special meaning under the TIA. The issue before the Court there was the meaning of "'punishment' and 'penalty' as those terms are used in 8 U.S.C. § 1101(a)(48)(A)." *Id.* at 137. The question whether a measure is a "punishment" or "penalty" within the meaning of a 1996 amendment to the INA has no bearing on the meaning of a different word, appearing in a different statute, adopted in a different era. And *Gonzales* is unhelpful to Maryland even on its own terms—it confirms that, "if [a] sanction is imposed as retribution" and "to operate as a warning to similarly situated individuals," then it "is a punishment or penalty due to its punitive character." *Id.* at 138 (cleaned up). That covers the assessment here.

Nor is *Liberty University* helpful to the State. As a starting point, it did not cite or discuss *Valero*, *RILA*, or *GenOn*, let alone overrule those cases. And this Court has continued to apply the traditional TIA multifactor test after *Liberty University* was decided. *See Norfolk Southern*, 916 F.3d at 319.

Moreover, *Liberty University* emphasized a "functional approach" to evaluating the nature of a state levy for Tax-Clause purposes. 733 F.3d at 96. Given the particular facts of that case, it discussed four specific factors. But in discussing those factors, the Court did not purport to establish them as exclusive of all other considerations. On the contrary, it explicitly acknowledged that the Supreme Court continues "to distinguish taxes from penalties" for a variety of reasons. *Id.* Among other things, an assessment of "an exceedingly heavy financial burden" may "become so punitive" by virtue of its size that it ceases to be a "tax" and becomes a non-tax "penalty" (733 F.3d at 97-98), which we have said all along is the case here. *Accord NFIB*, 567 U.S. at 544, 566 (affirming that a "severe" "financial punishment" does not constitute a tax).

### B. Measured against the correct standards, the Act imposes a punitive fee, review of which is not barred by the TIA

The State cannot refute our showing (Opening Br. 41-45) that this Court's (and other court of appeals') contemporary TIA analysis embraces a range of considerations embedded within the three-factor test identified in *Valero* and *GenOn*. *See Norfolk Southern*, 916 F.3d at 326 (Wynn, J., concurring) (this Court's "decisions distinguishing between taxes and fees have not always rigorously adhered to the three-factor analytical framework," focusing on many "subfactors" as well). Nearly all of those considerations weigh

decisively in appellants' favor here: (1) the "sheer size" of the Act's assessment here "screams 'penalty'" (*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013)); (2) the inclusion of a pass-through provision is "unavoidably punitive" and cannot be justified as anything "other than punishment" (*ConEd v. Pataki*, 292 F.3d 338, 353-355 (2d Cir. 2002)); (3) the proceeds are not deposited in the general treasury but rather set aside in a segregated fund used for remediation (Compl. ¶ 39); and (4) the "circumstances surrounding the Act's enactment" and its legislative history demonstrate that the charge bears a punitive purpose (*RILA v. Fielder*, 475 F.3d 180, 189 (4th Cir. 2007); *accord GenOn*, 650 F.3d at 1025).

The State's counterarguments are unpersuasive. The State observes (Br. 29), for example, that the Act was enacted by the legislature and not adopted by a regulatory agency. That is true, but it was true in *GenOn* and *RILA*, too. Under this Court's precedents, that fact cannot by itself "disguise what is in substance a punitive [fee]" according to every other relevant consideration. *GenOn*, 650 F.3d at 1024.

Maryland next appears to acknowledge (Br. 29-30) that the narrow targeting of the levy indicates a punitive fee (*see* Opening Br. 47-50), but brushes that point aside as "relatively minor" and not "decisive." Of course, narrow targeting, even if not dispositive, may still be strong evidence that the legislature intended to punish a handful of specific companies. That fact

is confirmed further by the pass-through provision. As noted in *Valero*, when "the cost of the charge [can be] passed" on to customers, it ensures that even a narrow population of payers can "spread the cost to a significantly wider proportion of the population." 205 F.3d at 134. A legislature's effort to inhibit the spreading of the charge in this case can be explained only by lawmakers' intent that the cost be borne exclusively by those whom the legislature intends to punish.

Finally, the State asserts (Br. 30) that the Act's levy "unquestionably benefits the general public." But as the First Circuit has noted, it "can be said of virtually all activity by a state and all sources of state revenue" that "the activity serves the public benefit." *American Trucking Associations v. Alviti*, 944 F.3d 45, 52-53 (1st Cir. 2019). The question posed by the TIA is narrower—it is whether "an injunction would pose a 'threat to the central stream of tax revenue relied on by' the state" to run its general operations. *Id.*; *see* S. Rep. No. 1035, 75th Cong., 1st Sess. 2 (1937) (Congress's concern was for assessments whose withholding would "seriously disrupt State and county finances"); H.R. Rep. No. 1503, 75th Cong., 1st Sess. 2 (1937) (similar). Courts thus have been careful to limit the TIA to classic fund-raising taxes. *See Bidart Bros.*, 73 F.3d at 929. Funds that are "placed in a segregated account and expended by a single entity for a single purpose" will rarely meet that description. *American Trucking*, 944 F.3d at 53.

27

The TIA is thus no bar to appellants pursuing their constitutional and statutory challenges to the Act in federal court, and the district court erred in concluding otherwise.

## CONCLUSION

The Court should reverse the district court's dismissal for mootness and remand with instructions to grant relief on Count IV of the complaint. It also should reverse the dismissal of Counts I-III under the TIA and remand to address the merits of those claims.

Dated: March 16, 2023

Respectfully submitted,

/s/ *Michael B. Kimberly*

Tara S. Morrissey
Jennifer B. Dickey
  *U.S. Chamber Litigation Center*
  *1615 H Street NW*
  *Washington, DC 20062*
  *(202) 463-5337*

Michael B. Kimberly
Sarah P. Hogarth
Charles Seidell
  *McDermott Will & Emery LLP*
  *500 N. Capitol St. NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for the Chamber of Commerce*
*of the United States of America*

*Counsel for all Appellants*

28

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), under-signed counsel for intervenors certifies that this brief:

(i)    complies with the type-volume limitation of Rule 32(a)(7) because it contains 6,493 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii)   complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word and is set in Century Supra in 14 points.

Dated: March 16, 2023                    /s/ *Michael B. Kimberly*